## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| CHRISTOPHER "CHIP" PAUCEK and PRO ATHLETE COMMUNITY, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>DAHN SHAULIS,<br><br>Defendant. | Civil No. 24-9807 (RMB-AMD)<br><br>**OPINION** |

**APPEARANCES**

BAKERHOSTETLER
Chad A. Rutkowski
Oren J. Warshavsky (*pro hac vice*)
1735 Market Street, Suite 3300
Philadelphia, PA 19103

*Attorneys for Plaintiffs Christopher "Chip" Paucek and Pro Athlete Community, Inc.*

POLLOCK COHEN LLP
Adam L. Pollock
111 Broadway, Suite 1804
New York, NY 10006

*-and-*

THE SERBAGI LAW FIRM, P.C.
Christopher Serbagi (*pro hac vice*)
488 Madison Avenue, Suite 10022
New York, NY 10022

*Attorneys for Defendant Dahn Shaulis*

**RENÉE MARIE BUMB, Chief United States District Judge**

## I.    INTRODUCTION

A free marketplace of ideas tolerating "uninhibited, robust, and wide-open" "debate on public issues" is an empty "national commitment" if the cost of speaking is financial ruin at the end of a long legal battle. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That is why many states have passed anti-SLAPP laws. Anti-SLAPP laws shift the economic burden imposed by lawsuits filed to silence a critic's protected speech by requiring the plaintiff to pay a prevailing defendant's legal fees and costs. To that end, anti-SLAPP laws are designed to neutralize the chilling effect of litigation implicating a defendant's protected expression.

In this case, Plaintiffs Chip Paucek, a tech CEO, and his company, Pro Athlete Community, Inc. have sued Defendant Dahn Shaulis, a blogger, for calling Paucek a "consummate con man" and putting his audience on a "scam alert" regarding Paucek and his company. Shaulis now seeks refuge under New Jersey's recently enacted anti-SLAPP statute, seeking to recover his fees, costs, and expenses if he can successfully dismiss the complaint.

This Opinion addresses an unanswered and important threshold question: does New Jersey's anti-SLAPP statute apply in federal court? The Court holds that while some provisions of the statute conflict with the Federal Rules of Civil Procedure, the statute's fee-shifting provision—awarding fees, costs, and expenses to a defendant who prevails under Federal Rule 12 or Federal Rule 56—does not. Because New Jersey law

governs all of the claims in this case, Shaulis can shift fees, costs, and expenses, if he can successfully dismiss the complaint under Rule 12 or Rule 56.

## II.    FACTUAL BACKGROUND[1]

### A.    Chip Paucek and 2U Inc.

Plaintiff Chip Paucek is an entrepreneur and business executive in the education sector. [Compl. ¶ 12.] He previously served as the CEO of Smarterville, Inc., the parent company of Hooked on Phonics, whose prolific and catchy advertisements in the 1990s marketed and produced educational videos designed to teach young students how to read. [*Id.* ¶ 14.]

In 2008, Paucek departed Smarterville to co-found and lead, as CEO, 2U, Inc. ("2U"). [*Id.* ¶ 15.] 2U is an education technology company that partners with colleges and universities to develop and market online degree programs, mostly for graduate school. [*Id.* ¶ 15 (citing Antoine Gara, *Ivory Tower In The Cloud: Inside 2U, The $4.7 Billion Startup That Brings Top Schools To Your Laptop*, FORBES (Sept. 25, 2018), https://www.forbes.com/sites/antoinegara/2018/09/25/mbas-in-pjs-inside-2uthe-47-billion-startup-that-brings-top-schools-to-your-laptop/).]    In    exchange    for

---

[1] The Court draws the following factual background from the allegations in the parties' pleadings. [Docket No. 1 ("Compl."); Docket No. 25, Amended Answer and Counterclaim ("A&C")]; *Aruai v. Mallozzi*, 2014 WL 3600482, at *5 (E.D. Pa. July 21, 2014) (considering articles referenced in pleadings); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007) (district court entitled to take notice of full contents of published articles referenced in pleadings under Federal Rule of Evidence 201). The Court also refers to publicly available documents subject to judicial notice, including regulatory and court filings. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (regulatory filings); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (judicial opinions).

developing and marketing the online learning platform and recruiting students to enroll in online graduate degree programs with its partner schools, 2U takes a cut of the tuition dollars charged by the partner schools. [*Id.*]

The business model was a success. Under Paucek's leadership, 2U entered into lucrative partnerships with dozens of elite private universities to develop and market their online degree programs. [*Id.* (naming Harvard, Yale, Georgetown, and the University of Southern California as some of 2U's partner schools).] Paucek led a $100 million initial public offering for the company, and by 2018, 2U was "the nation's leading provider of software for universities." [*Id.*]

But 2U began facing economic headwinds. Competition in the online education sector increased (both from other companies, as well as from schools seeking to cut out the middleman and run their own online learning platforms), university tuitions rose, and enrollment in online education programs started to decline. [A&C ¶ 144 (citing Melissa Korn, *The Long, Steep Fall of an Online Education Giant*, WALL STREET J. (May 12, 2024), https://www.wsj.com/us-news/education/education-technology-2u-debt-e7218eeb).] Despite these challenges, 2U and Paucek projected confidence to the company's investors about 2U's future revenue growth. [A&C ¶ 147.]

By early 2020, however, the headwinds were too strong. 2U disclosed in its public filings that it had "incurred significant net losses," and that the company was "uncertain about [its] future profitability." *See* 2U, Inc., Annual Report (Form 10-K) (Feb. 27, 2020). 2U predicted that the "value of [the] company and [its] common stock could decline significantly." [*Id.*] And it did. 2U's stock plummeted. [A&C ¶ 145.]

Hoping to turn around its economic fortunes, 2U began taking on significant debt to acquire other online education platforms. [A&C ¶ 144 (citing Korn, *supra*).] It did not work. Meanwhile, sales continued to slow and partner schools started to unwind their once-lucrative contracts with 2U, further sinking the company's stock price. [*Id.*] Investors filed class action securities lawsuits accusing 2U of misleading them about the company's projected success. [A&C ¶¶ 122–29.] In one case, a Maryland federal district court denied 2U's motion to dismiss finding that the company's declining enrollment projections were material information that Paucek was required to disclose and that the class plaintiffs adequately alleged that Paucek omitted disclosing the declining enrollment projections with scienter. [A&C ¶ 122 (citing *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *31–41, 51–57 (D. Md. Aug. 5, 2021).] 2U settled the lawsuit for $37 million. [A&C ¶ 130 (citing *In re 2U, Inc. Sec. Class Action*, No. 8:19-cv-3455 (TDC), Docket No. 224-3 (D. Md. June 2, 2022) (stipulation and agreement of settlement)); *id.* ¶¶ 131, 146.]

2U also faced growing criticism from students. A 2021 Wall Street Journal investigation reported that 2U aggressively recruited students to enroll in costly online graduate programs offered through its prestigious university partners. [*See* A&C ¶ 144 (citing Lisa Bannon & Melissa Korn, *USC Pushed a $115,000 Online Degree. Graduates Got Low Salaries, Huge Debts*, WALL STREET J. (Nov. 9, 2021), https://www.wsj.com/articles/usc-online-social-work-masters-11636435900).] Some of the students targeted by these recruitment efforts apparently would not have qualified for admission to the equivalent in-person programs. [*Id.*] And most could not

4

afford the tuition without taking on substantial student loans. [*Id.*] Nevertheless, they were admitted, graduated with significant debt, and often secured only low-paying jobs. [*Id.*] A proposed class of students later sued, alleging that 2U and the University of Southern California misled them into enrolling into graduate programs through manipulated U.S. News & World Report rankings. A federal court dismissed 2U from the lawsuit in 2023. *See Favell v. Univ. of S. California*, 2024 WL 751006 (C.D. Cal. Jan. 23, 2024).

Paucek stepped down as 2U CEO in late 2023. 2U's 2023 annual report expressed "substantial doubt … about [the company's] ability to continue as a going concern" if it could not refinance its debt or raise capital to reduce its debt in the short term. *See* 2U, Inc., Annual Report (Form 10-K) (Mar. 6, 2024). Not long after that forecast, the company filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. [A&C ¶ 131; *see In re 2U, Inc.*, Case No. 24-11279 (MEW) (Bankr. S.D.N.Y.).] The Bankruptcy Court recently confirmed a plan of reorganization and 2U now operates as a private entity. *See* 2U, Inc., Current Report (Form 8-K) (Sept. 4, 2024).

### B.   Paucek Launches Pro Athlete Community Inc.

Paucek's latest venture is Pro Athlete Community, Inc. ("PAC"), an education company he co-founded in 2022 and currently leads as co-CEO. [Compl. ¶ 17.] PAC provides "education, training, mentorship, networking, and other support" to assist professional athletes with transitioning into new careers when their playing days are

over. [*Id.* ¶ 18.] For example, PAC has partnered with the University of Miami's Herbert Business School to offer education certificate programs to its athlete clients to provide them "with the opportunity to form powerful relationships with industry experts and acquire skills that will allow them to be successful in their business endeavors." [*Id.* ¶ 19.] PAC has grown in membership to deliver its educational and career-development programming to over 350 professional athletes from the National Football League, the National Basketball Association, Major League Baseball, and the Ultimate Fighting Championship. [*Id.* ¶ 21.] The Company's testimonials page is full of glowing endorsements from its future and former superstar athlete members, including Arizona Cardinals wide receiver Marvin Harrison, Jr. and All-Pro defensive tackle and Super Bowl LV champion Ndamukong Suh. [*Id.* ¶ 23 (citing https://proathletecommunity.com/members/#stories (last visited May 6, 2025)).]

### C.    Dahn Shaulis and the Alleged Defamatory Statements

Defendant Dahn Shaulis is an independent blogger who covers the education sector. Shaulis neither buys the PAC hype nor, to put it mildly, does he think very highly of Chip Paucek as a businessman. Shaulis runs the Higher Education Inquirer ("HEI"), a "trusted source about the U.S. higher education industry, advocating for transparency [and] accountability[.]" [A&C ¶ 117.] Shaulis has covered 2U and Paucek for years on HEI. [*Id.* ¶¶ 117–19.] He has read 2U's regulatory filings, listened to its earnings calls, and has spoken to "experts in the field of higher education who know [] Paucek and have deep knowledge about his business practices" as well as "student debtors who [were] harmed by 2U programs." [*Id.* ¶ 119.]

6

On the social media website X, Shaulis (username @USinjustice) replied to a post:

> Jason, you guys in Miami need to investigate Chip Paucek and his latest scheme, Pro Athlete Community. Chip was the consummate con man with Hooked on Phonics and 2U.

[Compl. ¶ 27; Compl., Ex. A (the "X Post").][2]

And on HEI, a few months later, Shaulis posted the following:

**SCAM ALERT: Chip Paucek and Pro Athlete Community (aka PAC)**

[HEI] is conducting an extensive investigation of former 2U CEO Chip Paucek. While we are compiling and analyzing this information, HEI is putting out a warning to current and former professional athletes who may be contacted by Paucek's newest enterprise, [PAC].

As the co-CEO of [PAC], Chip Paucek rang the opening bell at NASDAQ on June 13, 2024, just months after driving another company, 2U, to near failure.

[PAC] is recruiting former professional athletes to become members, offering dreams of success. A number of former NFL players have already signed up and are being used to sell PAC's services.
…
From September 14–19, in Austin, Texas, PAC is holding live sessions to sell their dreams. The event is called Next Chapter U. They are also working with the University of Miami's Herbert School of Business on a certificate program for PAC members.

We encourage those who have been contacted by [PAC] to do their due diligence, given Paucek's track record as an unethical businessperson. We are also asking those who have been contacted to document any material statements made, to consult their lawyers, and to let us know what promises may be said on the back stage. We will share with you what we know.

---

[2] Because Shaulis later deleted the X Post, it is not clear to whom he was replying or the context of his reply.

[Compl. ¶ 28; Compl., Ex. B (the "First HEI Post").]

Paucek got wind of the First HEI Post and directed his lawyers to serve Shaulis with a cease-and-desist letter. [Compl. ¶ 43.] The letter demanded that Shaulis (i) remove the First HEI Post; (ii) issue a retraction withdrawing the Post, acknowledging that it was false; and (iii) refrain from making false or otherwise misleading statements about Paucek and PAC. [*Id*.] Shaulis removed the First HEI Post but ignored the remaining demands. [*Id*. ¶ 44.] When counsel for Paucek and PAC followed up a few days later, Shaulis responded that he would only issue a retraction of the First HEI Post if he could explain that he was being coerced to do so by Paucek and PAC and that the First HEI Post was, in fact, accurate. [*Id*. ¶ 45.] Those terms were unacceptable to Paucek and PAC. [*Id*.]

The next day, Shaulis made another post on HEI:

**HEI Receives Cease-and-Desist Letter from Chip Paucek's Lawyers**

[HEI] has received a cease-and-desist letter from lawyers representing Chip Paucek and [PAC]. Out of respect for PAC co-CEO Kaleb Thornhill and members of PAC, we have removed the article. However, we stand by all the facts of the story and our characterization about Mr. Paucek, the former CEO of 2U and Smarterville (aka Hooked on Phonics). These characterizations are based on information and opinions obtained from experts in the education business in addition to publicly available business records and government records [including] earnings call transcripts, consumer lawsuits, and citizen/consumer testimony.

[*Id*. ¶¶ 46–49]; Compl., Ex. C (the "Second HEI Post" and, together with the First HEI Post and the X Post, the "Alleged Defamatory Statements").] Days later, Paucek and PAC filed this lawsuit.

## III.  PROCEDURAL BACKGROUND

Paucek and PAC sue Shaulis for defamation and PAC additionally brings a claim against Shaulis for tortious interference with prospective business relations. [*See* Compl. ¶¶ 50–82.] Pursuant to this Court's Individual Rules and Practices, Shaulis filed a Pre-Motion Letter seeking leave to file a motion to dismiss the Complaint based on New Jersey's anti-SLAPP statute, the Uniform Public Expression Protection Act, N.J.S.A. 2A:53A-49, *et seq.* ("UPEPA" or "Act"). [Docket No. 8.] Plaintiffs filed a letter in response arguing that the laws of Maryland (Paucek's home state) and Delaware (PAC's home state), respectively govern Paucek's and PAC's claims such that UPEPA, a New Jersey law, does not apply. [Docket No. 10.] And, they argue, even if New Jersey law does apply, UPEPA does not apply in federal court because it conflicts with the Federal Rules of Civil Procedure.

The Court held a Pre-Motion Conference, and the parties agreed to first brief these threshold questions regarding choice of law and UPEPA's applicability in federal court before Shaulis filed a dispositive motion. [Docket Nos. 15, 26.] Shaulis also answered the Complaint with a counterclaim under UPEPA. [A&C ¶¶ 176–82.] The briefing on the threshold issues is now ripe. [Docket Nos. 27 ("Def.'s Br."); Docket No. 31 ("Pls.' Br."); Docket No. 37 ("Def.'s Reply").] The Court granted Plaintiffs leave to file a short sur-reply to address issues raised in Shaulis's reply brief regarding PAC's principal place of business. [Docket No. 41 ("Pls.' Sur-Reply"); *see also* Def.'s Reply at 2–6.]

## IV.    DISCUSSION

### A.    Jurisdiction

This Court has diversity jurisdiction over this dispute. 28 U.S.C. § 1332(a) (federal diversity lawsuits require that amount in controversy exceeds $75,000 and suit is between citizens of different states). Paucek is allegedly a citizen of Maryland, [Compl. ¶ 6], and PAC is allegedly incorporated under Delaware law with its principal place of business also in Delaware, [*id.* ¶ 7]. Shaulis is allegedly a New Jersey citizen. [*Id.* ¶ 8.] Plaintiffs seek over $75,000 in damages, exclusive of interest and costs. [*Id.* ¶ 9.]

### B.    SLAPP Lawsuits and Anti-SLAPP Statutes – Generally

Strategic lawsuits against public participation ("SLAPPs") are lawsuits filed to punish, silence, and intimidate defendants exercising their First Amendment rights. They are filed in an effort to force a defendant to abandon his speech or suffer through years of costly litigation. *See* Nicole J. Ligon, *Solving SLAPP Slop*, 57 U. RICH. L. REV. 459, 466 (2023).

Anti-SLAPP statutes protect defendants against the dangers of a SLAPP lawsuit. The strongest anti-SLAPP statutes broadly protect First Amendment rights by providing an expedited and streamlined process to dismiss claims implicating a defendant's speech to "reduc[e] the burden in terms of time and costs for a SLAPP defendant." Benjamin Ernst, *Fighting SLAPPS in Federal Court:* Erie*, The Rules Enabling Act, and the Application of State Anti-SLAPP Laws in Federal Diversity Actions*, 56 BOSTON

COLL. L. REV. 1181, 1188 (2015). They also commonly shoulder the *plaintiff* with a heightened burden at the pre-trial motion to dismiss or summary judgment stages to show that his claims are likely to succeed on the merits. *Id.* Normally, it is the *defendant* who must show, on a motion to dismiss, that the plaintiff's complaint fails to state a claim for relief or, when the defendant is the summary judgment movant, that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *See Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000) (A defendant "bears the burden of showing no claim has been stated" under Rule 12); *U.S. ex rel. Jones v. Rundle*, 453 F.2d 147, 150 (3d Cir. 1971) ("The burden of demonstrating the justification for a motion for summary judgment lies with the movant."). Anti-SLAPP statutes also usually mandate a stay of discovery "to prevent unnecessary expenditure of resources on the parties' and court's time." Ligon, *supra* at 484–85. Moreover, if the defendant loses his anti-SLAPP motion, he is entitled to take an immediate interlocutory appeal. Ernst, *supra* at 1188.

But if the defendant prevails on his anti-SLAPP motion, the plaintiff must pay the defendant's attorney's fees and costs. *Id.* at 1189. Mandatory anti-SLAPP fee-shifting is one of the most important features of an anti-SLAPP statute. *See* Brooke White, *The SLAPP Happy State: Now Is the Time for Ohio to Pass Anti-SLAPP Legislation*, 74 CASE W. RES. L. REV. 559, 582 (2023) (identifying fee-shifting provisions as "[o]ne of the most important features" of an anti-SLAPP statute). Generally speaking, if a plaintiff knows that he is on the hook to pay a prevailing defendant's fees and costs, he might think twice before filing a lawsuit based on his critic's speech. And if a

defendant knows that she can recover her fees and costs in defending against such a lawsuit, she is more likely to fight a legal battle in court rather than surrender to a settlement, which might include retracting her speech and, as a consequence, chilling public debate. *See* Eugene Volokh, First Amendment and Related Statutes, Problems, Cases and Policy Arguments 98 (8th ed.) (noting that "even an unfounded [SLAPP] suit … can cause the [defendant] to quickly settle").

### 1.    *New Jersey's anti-SLAPP Statute – UPEPA*

Two years ago, Governor Murphy signed New Jersey's anti-SLAPP statute, UPEPA, into law with the goal of protecting "people from meritless lawsuits intended to intimidate them for exercising their free speech rights." *See* N.J. Governor's Message, 2023 S.B. 2802/A.B. 4393, available at https://www.nj.gov/governor/news/news/562023/20230907d.shtml (last visited May 6, 2025). UPEPA features many of the classic anti-SLAPP hallmarks. It broadly applies to any cause of action asserted in a civil case including based on the defendant's "exercise of the right of freedom of speech or [] press … guaranteed by the United States Constitution or the New Jersey Constitution, on a matter of public concern." N.J.S.A. § 2A:53A-50(b)(3).[3] A court must promptly hold a hearing upon the defendant's dismissal motion (UPEPA calls the motion an application for an order to

---

[3] It also applies when the cause of action asserted is based on the defendant's "communication in a legislative, executive, judicial, administrative, or other governmental proceeding" or "communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding." N.J.S.A § 2A:53A-50(b)(1)–(2).

show cause) to dismiss the complaint and rule on the motion "as soon as practicable after [the] hearing." *Id.* §§ 2A:53A-51, 2A:53A-56. If the defendant successfully dismisses the cause of action implicating his speech on a matter of public concern, the Court must award costs, reasonable attorney's fees, and reasonable litigation expenses related to the filing of the dismissal motion. *Id.* § 2A:53A-58(1).[4] And if the defendant loses his anti-SLAPP dismissal motion, he may take an immediate interlocutory appeal. *Id.* § 2A:53A-57.

But UPEPA is also somewhat more constrained than other state anti-SLAPP statutes. It does not mandate a stay of discovery upon the filing of the application for an order to show cause (although there is a presumption that, if requested, a stay should be granted). *Id.* § 2A:53A-52(a). And (this is important) it does not necessarily shoulder the plaintiff with a heightened or inverted pre-trial burden to avoid dismissal. Instead, there are three independent dismissal standards. Similar to the strongest anti-SLAPP statutes, a court must dismiss the complaint and shift fees and costs if the plaintiff fails to establish a prima facie trial burden. *Id.* § 2A:53A-55(a)(3)(A). But it also must dismiss the complaint and shift fees and costs if the defendant meets its normal pre-trial burden to show that the plaintiff failed to state a cause of action upon which relief can be granted (*i.e.*, a motion to dismiss standard) or that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter

---

[4] The Court must shift fees and costs to the non-movant if he successfully survives dismissal and the court determines that the defendant's dismissal motion was frivolous or filed solely with intent to delay the proceeding. N.J.S.A. § 2A:53A-58(2).

13

of law (*i.e.*, a summary judgment standard). *Id.* §§ 2A:53A-52(a)(3)(B)(i)–(ii). Whichever standard the court relies upon, it can "consider the pleadings, the order to show cause application and supporting certifications, briefs, any reply or response to the order to show cause, and any evidence that could be considered in ruling on a motion for summary judgment." N.J.S.A. § 2A:53A-54.

### C.    UPEPA's Fee-Shifting Provision Applies in Federal Court

#### 1.    *The Applicability of an anti-SLAPP Law in Federal Court Depends on its Text and Structure*

The *Erie* doctrine provides that a federal court sitting in diversity applies state substantive law and federal procedural law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). But before deciding whether a law is substantive or procedural for purposes of *Erie*, sometimes a "hazy" distinction, *Erie*, 304 U.S. at 92 (Reed, J., concurring), a court must first determine whether a "Federal Rule is in direct collision" with the state law or rule that the court is being asked to apply, *Hanna v. Plumer*, 380 U.S. 460, 472 (1965); *Schmigel v. Uchal*, 800 F.3d 113, 119 (3d Cir. 2015), (*Erie* analysis first requires a court to "determine whether there is a direct collision between a federal rule and the state law or rule that the court is being urged to apply." (citation omitted)). If a state law or rule "answer[s] the same question" differently than the federal procedural rule, a federal court must apply the federal rule so long as the federal rule is otherwise constitutional and does not violate the Rules Enabling Act. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010) (majority op.); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015) (Kavanaugh, J.). Only

if the federal rule is inapplicable or invalid must a federal court "wade into *Erie*'s murky waters," *Shady Grove*, 559 U.S. at 398, and determine "whether the state law is outcome-determinative and whether failure to apply the state law would frustrate the twin aims of the *Erie* Rule to discourage forum shopping and avoid inequitable administration of the law," *Schmigel*, 800 F.3d at 119 (citations omitted). Finally, the court must consider "whether any countervailing federal interests prevent the state law from being applied in federal court." *Id*. (citation omitted).

Do anti-SLAPP statutes conflict with the Federal Rules of Civil Procedure? Paucek and PAC say yes—anti-SLAPP statutes like UPEPA conflict with Federal Rules 12 and 56 because they alter the pleading and evidentiary requirements under which a federal court must dismiss a case before trial. [Pls.' Br. at 27.] Shaulis says no—anti-SLAPP statutes like UPEPA do not conflict with Federal Rules 12 and 56 when, as here, the dismissal standards mirror those under Rules 12 and 56 and because mandatory fee-shifting provisions are a substantive component of state law that apply in federal diversity cases. [Def.'s Br. at 11–18.]

The federal courts of appeal have said maybe. Instead of adopting a categorical rule that anti-SLAPP statutes do or do not apply in federal court, the courts of appeal have examined the text and structure of each state anti-SLAPP statute in question to determine whether they conflict with the Federal Rules. *See CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1143 (9th Cir. 2022) ("[O]ur sister circuits have not uniformly decided that anti-SLAPP statutes cannot apply in federal court[.]"). They have reached different results with respect to different (or sometimes the same) state

15

anti-SLAPP statute in question. *Compare La Liberte v. Reid*, 966 F.3d 79, 87–88 (2d Cir. 2020) (holding California's anti-SLAPP law did not apply in federal court); *Klocke v. Watson*, 936 F.3d 240, 245–49 (5th Cir. 2019) *as revised* (Aug. 29, 2019) (holding Texas's anti-SLAPP law did not apply in federal court); *Carbone v. CNN, Inc.*, 910 F.3d 1345, 1347–57 (11th Cir. 2018) (holding Georgia's anti-SLAPP law did not apply in federal court); *Los Lobos Renewable Power, LLC v. Americulture, Inc*, 885 F.3d 659, 673 (10th Cir. 2018) (holding New Mexico's anti-SLAPP law did not apply in federal court); *Abbas*, 783 F.3d at 1333 (holding D.C.'s anti-SLAPP law did not apply in federal court), *with Block v. Tanenhaus*, 815 F.3d 218, 221 (5th Cir. 2016) (assuming without deciding that Louisiana's anti-SLAPP law applied in federal court); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (holding Nevada's anti-SLAPP law applied in federal court); *Godin v. Schencks,* 629 F.3d 79, 85–86 (1st Cir. 2010) (holding Maine's anti-SLAPP statute applied in federal court); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 971–72 (9th Cir. 1999) (holding California's anti-SLAPP law applied in federal court).

In *Abbas*, for example, the D.C. Circuit, in an opinion authored by then-Judge Kavanaugh, held that Washington D.C.'s anti-SLAPP statute conflicted with Federal Rules 12 and 56 by "setting up an additional hurdle a plaintiff must jump over to get to trial." 783 F.3d at 471. Like some of the strongest anti-SLAPP statutes, D.C.'s anti-SLAPP statute requires dismissal of claims "aris[ing] from an act in furtherance of the right of advocacy on issues of public interest" unless the plaintiff, without the benefit

16

of discovery, can show that her claims are likely to succeed on the merits. D.C. Code § 16-5502(b). The D.C. Circuit held that these provisions "answer[ed] the same question" about the circumstances under which a court must dismiss a case before trial" "differently" from Federal Rules 12 and 56 because Rules 12 and 56 "do not require a plaintiff to show a likelihood of success on the merits" in order to survive dismissal. 783 F.3d at 470–71. So, by imposing a higher pre-trial burden than required under the Federal Rules, the D.C. anti-SLAPP statute conflicted with the Federal Rules and could not apply in federal court. *Id*. at 471; *Klocke*, 936 F.3d at 246 (similarly holding Texas's anti-SLAPP statute inapplicable in federal court because it requires "clear and specific evidence that a plaintiff can meet each element of his claim"); *Carbone*, 910 F.3d at 1349–57 (similarly finding Georgia's anti-SLAPP statute inapplicable in federal court because it requires the "plaintiff to establish a probability that he will prevail on the claim asserted in the complaint"); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices, and Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 220 n.4 (D.N.J. 2021) (refusing to apply D.C. anti-SLAPP statute for same reasons as in *Abbas*).

Likewise, the Second Circuit in *La Liberte v. Reid* held that California's anti-SLAPP statute conflicted with the Federal Rules. 966 F.3d at 86–88.[5] The Second Circuit reasoned that the text of California's anti-SLAPP statute conflicted with

---

[5] The Ninth Circuit, on the other hand, has approved the application of certain parts of California's anti-SLAPP statute in federal court. *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001).

Federal Rules 12 and 56 because it answered the question of when a court must dismiss a plaintiff's claim before trial differently than Federal Rules 12 and 56. Under Rule 12(b)(6), a plaintiff's pleading burden is to plausibly—not probably—allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. California's anti-SLAPP statute "abrogate[d] that entitlement by requiring the plaintiff to establish," without discovery, "that success is not merely plausible but probable" in order to avoid dismissal and application of anti-SLAPP fee-shifting. *La Liberte*, 966 F.3d at 87 (quoting *Carbone*, 910 F.3d at 1353).

But in so holding, the Second Circuit also distinguished its earlier decision in *Adelson v. Harris*, 774 F.3d at 803. In *Adelson*, the Second Circuit approved certain aspects of Nevada's anti-SLAPP statute in federal court, including its mandatory fee-shifting provision. That was because Nevada's anti-SLAPP statute, unlike California's, did "not establish a reasonable probability of success standard that must be met without discovery[.]" *La Liberte*, 966 F.3d at 86 n.3 (quoting *Adelson v. Harris*, 973 F. Supp. 2d 467, 493 n.21 (S.D.N.Y. 2013)). Instead, the statute merely "rais[es] the substantive standard [] appl[ying] to a defamation claim" by immunizing "good faith communications … made without knowledge of falsity" and providing for mandatory fee-shifting if the defendant successfully dismisses a lawsuit concerning such communications. *La Liberte*, 966 F.3d at 86 n.3; *see also Adelson*, 774 F.3d at 809 (finding Nevada's immunization from civil liability and mandatory fee-shifting provisions to be "unproblematic").

18

Thus, asking whether anti-SLAPP statutes do or do not apply in federal court is not the pertinent question. The correct question is "whether a particular state's anti-SLAPP law['s] unique text and structure" conflicts with the Federal Rules. Matthew L. Schafer & Tanvi Valsangikar, *The Application of the New York Anti-SLAPP Scheme in Federal Court*, 2 J. FREE SPEECH L. 573, 583 (2023); *Reed v. Chamblee*, 2024 WL 69570, at *6 (M.D. Fla. Jan. 5, 2024), *appeal dismissed in part*, 2024 WL 806194 (11th Cir. Feb. 27, 2024) ("The specific requirements and language in each state's anti-SLAPP statute must be analyzed individually[.]"). Some do. Some do not.

### 2.    *Some Provisions of UPEPA Conflict with the Federal Rules*

Unquestionably, some provisions of UPEPA conflict with the Federal Rules. Recall that in addition to mandating a shift of attorney's fees and costs if the defendant prevails under UPEPA's standards mirroring Rules 12 and 56, UPEPA also authorizes a court to shift fees and costs if the non-movant plaintiff fails to "establish a prima facie case as to each essential element" of his claims. N.J.S.A. § 2A:53A-55(a)(3)(A). That standard conflicts with the Federal Rules. Establishing a prima facie case is the plaintiff's burden *at trial*, requiring him to produce enough evidence to raise an issue for the trier of fact. *See Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003). Requiring a plaintiff to meet that burden *before trial* is more than required under the Federal Rules. Before trial, a plaintiff merely has to plead her claims adequately to survive dismissal. *See* FED. R. CIV. P. 8(a)(1). It is the *defendant*'s burden under Rule 12 to show that she has failed to do so. And it is the *defendant*'s burden to show under

Rule 56 that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law. Thus, UPEPA's prima facie standard of dismissal conflicts with the Federal Rules by "nullif[ying]" a plaintiff's entitlement to trial if he can overcome a motion to dismiss or motion for summary judgment. *Abbas*, 783 F.3d at 1334; *Peach v. Hagerman*, 2024 WL 1748443, at *6 (W.D. Ky. Apr. 23, 2024) (holding that Kentucky's anti-SLAPP statute conflicted with Rule 12 because "establishing a prima facie case is a higher burden than "simply pleading [] claims adequately" as required by Rule 12(b)(6)." (quoting *Mucerino v. Martin*, 2021 WL 5585637, at *5 (M.D. Tenn. Nov. 30, 2021) (holding the same as to Tennessee's anti-SLAPP statute))).

Other provisions of UPEPA also conflict with the Federal Rules. *First*, UPEPA provides that, in considering anti-SLAPP relief, a court can consider "any evidence that could be considered in ruling on a motion for summary judgment." N.J.S.A. c 2A:53A-54. That provision conflicts with Rule 12, which only permits a district court to consider the allegations in the pleadings, exhibits attached to the pleadings, as well as matters of public record and other judicially noticeable documents. *Schmidt*, 770 F.3d at 249. When "matters outside the pleadings" are presented to and not excluded by the court on a Rule 12 motion, the court must instead convert the motion into one for summary judgment after giving proper notice to the parties. FED. R. CIV. P. 12(d); *In re Rockefeller Ctr. Prop., Inc. Secs. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). By permitting a court to consider matters outside the pleadings, UPEPA would improperly force a plaintiff to defend every motion to dismiss as if it was a motion for

summary judgment. *Peach*, 2024 WL 1748443, at *6 (finding identical provision to conflict with federal rules).

*Second*, UPEPA's right to an immediate interlocutory appeal if the court denies the defendant's dismissal motion, N.J.S.A. § 2A:53A-57, conflicts with the Federal Rules and federal statutes. *See Ernst v. Carrigan*, 814 F.3d 116, 119 (2d Cir. 2016) (rejecting interlocutory appeal from denial of Vermont anti-SLAPP motion). The appellate jurisdiction of the federal courts, set by Congress, extends only to final orders. 28 U.S.C. § 1291; FED. R. APP. P. 4 (appeals as of right). Unless otherwise permitted by federal statute or rule, *see, e.g.*, 28 U.S.C. § 1292(a)(1) (interlocutory appeals relating to injunctive relief); FED. R. CIV. P. 23(f) (interlocutory appeals from order granting or denying class action certification), a party can only appeal an interlocutory order under narrow circumstances. *See* 28 U.S.C. § 1292(b) (District Court finds that order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation"); FED. R. APP. P. 4 (appeals by permission); *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (collateral order appealable if it conclusively resolves important question separate from the merits and would be effectively unreviewable on appeal from final judgment).

*Third*, UPEPA's presumption for a court to stay discovery if requested by one of the parties also conflicts with the Federal Rules. "[D]iscovery-limiting aspects" of anti-SLAPP statutes do not apply in federal court because the Federal Rules "reflect a

policy of forcing a defendant to disclose adverse facts before he may challenge plaintiff's case for factual sufficiency." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, C.J., concurring) (citing *Metabolife*, 264 F.3d at 845 (9th Cir. 2001) (holding that the discovery-limiting aspects of California's anti-SLAPP statute conflicted with Rule 56)).

Shaulis, however, disagrees with little of this. He does not ask this Court to apply any of UPEPA's "exotic state procedural rules," *Makaeff*, 715 F.3d at 275 (Kozinski, C.J., concurring). He only wants to shift fees, costs, and expenses under UPEPA if he can successfully dismiss the Complaint.

### 3.    *A Defendant Can Shift Fees, Costs, and Expenses under UPEPA if He Dismisses the Complaint Under Rule 12 or Rule 56*

The Court finds that Shaulis can shift fees, costs, and expenses if he can successfully dismiss the Complaint under Rules 12 or 56. UPEPA mandates an award of "reasonable attorney's fees, and reasonable litigation expenses," N.J.S.A. § 2A:53A-58(1), if a defendant successfully dismisses any cause of action brought against him implicating his exercise of First Amendment rights on a matter of public concern, *id.* § 2A:53A-50(a)(1),[6] under one of three standards:

    (i)    The plaintiff fails to establish a prima facie case as to each essential element of any cause of action in the complaint; or

    (ii)   The defendant establishes that the plaintiff failed to state a cause of action upon which relief can be granted; or

---

[6] The plaintiff also has a chance to establish that the Act does not apply, that is, that it does not implicate the defendant's speech on a matter of public concern. N.J.S.A. § 2A:53A-50(a)(2).

(iii)    The defendant establishes that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

*Id.* §§ 2A:53A-50(a)(3)(A)–(B).

As discussed above, the first standard conflicts with Rules 12 and 56. But the latter two standards, which are independent from the first, are on all-fours with Federal Rules 12 and 56. They "answer the same question about the circumstances under which a court must dismiss a case before trial" in the same way as Federal Rules 12 and 56. *Abbas*, 783 F.3d at 1333–34; *La Liberte*, 966 F.3d at 87. So, unlike the D.C. or California anti-SLAPP statutes in *Abbas* and *La Liberte*, UPEPA's latter two dismissal standards do not "require[] the [P]laintiff[s] to make a showing that the Federal Rules do not require" in order for a defendant to shift fees and costs. *La Liberte*, 966 F.3d at 87. All a defendant has to do is file an ordinary Rule 12 or Rule 56 motion at the appropriate stage of the litigation and prevail under the familiar standards governing those motions.

Plaintiffs argue that UPEPA's prima facie dismissal standard, and its other inapplicable procedural provisions identified above, dooms the Act's application in federal court. The Court disagrees.

*First*, unlike the statutes in *Abbas* or *La Liberte*, UPEPA does not *require* that a court shoulder the plaintiff with a prima facie burden to avoid pre-trial dismissal. A court can award fees under the statute if *either* the plaintiff fails to meet its prima facie trial burden; *or* the defendant meets a Rule 12 motion to dismiss standard; *or* the defendant meets a Rule 56 summary judgment standard. N.J.S.A. § 2A:53A-55(a). As

23

discussed, UPEPA's prima facie standard is plainly not on the menu of pre-trial dismissal options from which a federal court could apply in order to shift fees and costs under UPEPA because that provision conflicts with the pre-trial dismissal standards of Rule 12 and Rule 56. But UPEPA's latter two standards, mirroring Rules 12 and 56, do not conflict with the Federal Rules. So, if a defendant files an ordinary Rule 12 or Rule 56 motion and prevails on that motion, he triggers UPEPA's mandate to shift fees and costs.

*Second*, an all-or-nothing approach to applying UPEPA in federal court ignores the significance of the statute's severability clause which provides that "[i]f any provision of [the] Act or its application to any person or circumstance is held invalid," that invalidity "does not affect other provisions or applications of [the] [A]ct[.]" N.J.S.A. § 2A:53A-61. UPEPA's prima facie dismissal standard is "invalid" as applied in federal court because it is not "legally binding" in federal court. *See Invalid*, BLACK'S LAW DICTIONARY (12th ed. 2024). Thus, the question, under New Jersey law, *Trade Waste Management. Ass'n, Inc. v. Hughey*, 780 F.2d 221, 231 (3d Cir. 1985) (explaining that severability is a question of state law), is whether UPEPA's "objectionable features can be excised without substantial impairment of the principal legislative objective," *id*. (citing *State v. Lanza*, 143 A.2d 571 (N.J. 1958), *appeal dismissed*, 358 U.S. 333 (1959)).

24

The Court finds that UPEPA's legislative objectives are not substantially impaired if its objectionable provisions are invalid in federal court. The Act is meant to be "broadly construed and applied to protect the exercise of the right of freedom of speech and of the press, the right to assembly and petition, and the right of association, guaranteed by the United States Constitution or the New Jersey Constitution." N.J.S.A. § 2A:53A-59. One crucial way UPEPA protects those rights is by shifting fees and costs to a prevailing movant. By severing the portions of UPEPA that conflict with the Federal Rules, the Court protects the statute's fee-shifting provision, an important economic incentive reflecting the Legislature's intention to broadly protect free speech rights.[7] Thus, the Court sees no reason to disturb the Act's presumption of severability. *Old Coach Dev. Corp. v. Tanzman*, 881 F.2d 1227, 1234 (3d Cir. 1989) ("Under New Jersey law [a severability clause] [] creates a presumption that the invalid sections of the [statute] are severable.").

*Third*, the Court is aware of no authority requiring it to hold that UPEPA either applies in federal court as a whole or else it does not apply in federal court at all. Both the Second and Ninth Circuits have disclaimed such a result having struck down or

---

[7] Of course, another important component of anti-SLAPP statutes is that they *quickly* dispose of SLAPPs. UPEPA's mandate to quickly resolve motions implicating a defendant's speech appears to be a purely procedural rule that cannot apply in federal court. *See Los Lobos*, 885 F.3d at 673 (holding that New Mexico's anti-SLAPP statute could not apply in federal court because it was "not designed to influence the outcome of an alleged SLAPP suit but only the timing of that outcome") (emphases removed). But UPEPA still furthers important legislative goals without its provisions directing a court to resolve the dismissal motion as soon as possible because it still shifts fees if a defendant secures dismissal, an unquestionably crucial incentive to deter SLAPP suits.

otherwise questioned certain anti-SLAPP provisions conflicting with the Federal Rules while permitting the application of other provisions in the same statute that do not conflict with the Federal Rules. *Metabolife*, 264 F.3d at 845 (rejecting the discovery-limiting aspects of California's anti-SLAPP statute while approving its fee-shifting mechanism); *Adelson*, 774 F.3d at 809 (questioning the discovery-limiting aspects of Nevada's anti-SLAPP statute but finding its mandatory fee-shifting provision to be "unproblematic"); *see also* Schafer & Valsangikar, *supra* at 598 ("[E]ven within a single state's anti-SLAPP law, some provisions of that law may apply while other provisions may not.").

*Finally*, the Ninth Circuit has instructed its lower courts to construe anti-SLAPP statutes in a manner "prevent[ing] the collision of [] state procedural rules with federal procedural rules." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *as amended*, 897 F.3d 1224 (9th Cir. 2018). In *Planned Parenthood*, the Ninth Circuit construed California's anti-SLAPP statute, which requires a plaintiff to establish a likelihood of success to avoid dismissal, to simply mirror the requirements of Rules 12 and 56. *Id.* at 833–34; Cal. Civ. Proc. Code § 425.16. It held that when an anti-SLAPP motion under California law challenges the legal sufficiency of a claim, a district court should apply a Rule 12 motion to dismiss standard for failure to state a claim, and when an anti-SLAPP motion under California law challenges the factual sufficiency of a claim, a district court should apply a Rule 56 summary judgment standard. *Planned Parenthood*, 890 F.3d at 834; *see also Shady Grove*, 559 U.S. at 418 (Stevens, J., concurring) ("[F]ederal rules must be interpreted

with some degree of 'sensitivity to important state interests and regulatory policies[.]'" (quoting *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 426 n.7 (1996)). Applying the Ninth Circuit's guidance to harmonize state anti-SLAPP laws with the Federal Rules, a Washington State federal district court, interpreting the State's anti-SLAPP statute—which articulates the exact same three dismissal standards as UPEPA—held that so long as the defendants relied on the statute's Rule 12 standard at the motion to dismiss stage (as opposed to its prima facie or summary judgment standard) the statute could apply in federal court. *See Project Veritas v. Leland Stanford Junior Univ.*, 2022 WL 1555047, at *3 (W.D. Wash. May 17, 2022).[8]

Of course, federal courts cannot rewrite a state statute to avoid conflicts with the Federal Rules. *See Shady Grove*, 559 U.S. at 403 (in determining whether a state statute conflicts with a federal law or rule, court cannot "rewrite" the statute); *Abbas*, 783 F.3d at 471 (rejecting defendant's invitation to construe D.C. anti-SLAPP statute consistent with the Federal Rules because it would require court to rewrite the statute).

---

[8] Kentucky's anti-SLAPP statute also provides for the same three dismissal standards as both UPEPA and Washington's anti-SLAPP statute. Ky. Rev. Stat. Ann. § 454.472 (court shall dismiss action if "responding party fails to establish a prima facie case as to each essential element of the cause of action" or "moving party establishes that … responding party failed to state a cause of action upon which relief can be granted" or "[t]here is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the action"). One federal district court in Kentucky has held that because the prima facie standard conflicts with the Federal Rules, the statute cannot apply in federal court at all. 2024 WL 1748443, at *6. But, as described above, there is nothing in UPEPA requiring the Court to make findings under all three dismissal standards which operate independently from one another. Additionally, the Kentucky anti-SLAPP statute, unlike UPEPA, does not include a severability clause.

Arguably, the Ninth Circuit in *Planned Parenthood* did exactly that by reading California's anti-SLAPP statute coextensively with Rules 12 and 56, even though the statute's likelihood of success dismissal standard is clearly higher than required under Rule 12 or Rule 56. Here, however, the Court does not have to rewrite anything in UPEPA. UPEPA expressly offers two dismissal standards that are identical to Rules 12 and 56.

Plaintiffs try one final argument: the Uniform Law Commission's Model UPEPA statute—upon which New Jersey's UPEPA was based—is evidence that UPEPA does not apply in federal court. [Pls.' Br. at 28–29 (citing Uniform Law Commission, Model UPEPA (Oct. 2, 2020)).] That is because, they argue, the Model UPEPA statute employs a three-phase burden-shifting framework requiring a plaintiff to establish a prima facie case for each essential element of the cause of action challenged before shifting the burden to the defendant to meet a motion to dismiss or summary judgment burden. *See* UPEPA Model Law § 7; *Klocke*, 936 F.3d at 245–46 (finding burden-shifting framework of Texas's anti-SLAPP statute to conflict with the Federal Rules). But UPEPA does not employ a burden-shifting framework. It articulates three different and independent standards under which a defendant can recover fees. The prima facie standard conflicts with the Federal Rules and is invalid in federal court. The latter two standards, however, do not.

**4.** *UPEPA's Mandatory Fee-Shifting for Prevailing Defendants is Substantive and Applies in Federal Court if a Defendant Secures Dismissal Under Rule 12 or Rule 56*

The Court concludes that UPEPA's mandatory fee-shifting provision for prevailing defendants is substantive for purposes of *Erie*. "Under the bedrock principle known as the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) (cleaned up). Fee-shifting statutes can be broadly classified as one-way shift statutes or two-way shift statutes. John F. Vargo, *The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice*, 42 AM. U. L. REV. 1567, 1589 (1993). A one-way shift statute moves fees and costs in favor of a successful designated party-beneficiary, usually a plaintiff. *Id.* A two-way shift statute moves fees and costs to the loser, regardless of whether the loser is the plaintiff or the defendant. *Id.* UPEPA is a one-way shift statute that shifts fees and costs to moving party (usually the defendant) who successfully dismisses a complaint implicating his First Amendment speech on a matter of public concern. N.J.S.A. § 2A:53A-58(1).

Fee-shifting statutes are generally considered substantive under *Erie* because they are tied to the outcome of the litigation. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 52–54 (1991) ("fee-shifting rules that embody a substantive policy, such as a statute which permits a prevailing party in certain classes of litigation to recover fees" apply in federal diversity cases); *Chin v. Chrysler LLC*, 538 F.3d 272, 279 (3d Cir. 2008) (fee-shifting statutes are substantive for purposes of *Erie*). Indeed, as the Second Circuit has

explained, mandatory fee shifting under a state anti-SLAPP statute is "unproblematic" because fee-shifting statutes apply in diversity actions as part of a state's substantive law. *See Adelson*, 774 F.3d at 809; *see also Abbas*, 783 F.3d at 472 (suggesting that a prevailing-party statute awarding attorney's fees to defendants in defamation cases could have applied in federal court so long as the circumstances under which a defendant could recover fees did not impose standards "different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56"). Fee-shifting statutes, however, are procedural and do not apply in federal court when they assess costs and fees based on a litigant's "bad faith conduct in litigation." *Chambers*, at 52–54; *see id.* at 59 (Scalia, J., dissenting); *Shady Grove*, 559 U.S. at 407 (procedural rules regulate "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them").

Subsection (1) of UPEPA's fee-shifting provision—which applies to a prevailing movant who successfully dismisses a lawsuit filed in response to their exercise of First Amendment rights on a matter of public concern—is substantive. *See Adelson*, 774 F.3d at 809; *see also cf. Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1323 (S.D. Fla. 2020) ("At bottom, Florida's [anti-SLAPP] statute is a garden variety fee-shifting provision, which the Florida legislature enacted to accomplish a fundamental state policy—deterring SLAPP suits" (internal quotation marks and citation omitted)). Its application is tied to the outcome of a lawsuit implicating a defendant's speech on matters of public concern, a substantial policy of New Jersey to deter meritless SLAPP

30

suits. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975) ("[S]tate law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed."). So long as the defendant successfully dismisses the complaint under Rule 12 or Rule 56, UPEPA mandates that the court shall award fees, costs, and expenses related to the filing of the dismissal motion. N.J.S.A. § 2A:53A-58(1).

Now contrast Subsection (1) of UPEPA's fee-shifting provision with Subsection (2) which provides that the *non-moving* party (usually a plaintiff) can also shift fees, costs, and expenses from the moving party if he successfully defeats an anti-SLAPP dismissal motion *and* the court determines that the anti-SLAPP dismissal motion was frivolous or filed solely with intent to delay the proceeding. N.J.S.A. § 2A:53A-58(2). Subsection (2), thus, is a procedural fee-shifting provision that cannot apply in federal court because it only serves to punish defendants for filing a bad faith or frivolous motion to dismiss or summary judgment. Subsection (1), however, does not limit fee-shifting to circumstances where the claims were frivolous or filed in bad faith. So, Subsection (1) is a substantive provision of state law applying any time a defendant successfully dismisses the complaint, whether or not the complaint was frivolously filed.

In *Los Lobos*, the Tenth Circuit considered the structure of a similar fee-shifting statute. 885 F.3d at 671–72. The first sentence of Subsection (B) of New Mexico's anti-SLAPP fee-shifting provision resembles Subsection (1) of UPEPA's fee-shifting provision. It provides that a court shall "award reasonable attorney fees and costs

31

incurred by the moving party in defending the action," without requiring the court to find the claims frivolous or brought in bad faith. N.M. Stat. Ann. § 38-2-9.1(B). And the second sentence of Subsection (B) resembles Subsection (2) of UPEPA's fee-shifting provision. It provides that the non-moving party can shift fees, costs, and expenses from the moving party if he successfully defeats an anti-SLAPP dismissal motion and the court determines that the dismissal motion was "frivolous" or filed "solely" with "inten[t] to cause unnecessary delay." *Id.* Even though only the second sentence of Subsection (B) conditions the recovery of fees on the frivolousness or bad faith filing of the motion, the Tenth Circuit held that the entire fee-shifting section was a procedural sanctions statute that did not apply to a federal court sitting in diversity. 885 F.3d at 671–72.

*Los Lobos* and the New Mexico anti-SLAPP statute are distinguishable, however. In concluding that the fee-shifting section of New Mexico anti-SLAPP statute was a procedural sanctions provision , the Tenth Circuit considered the title of the section—"[s]pecial motion to dismiss *unwarranted or specious lawsuits*; procedures; *sanctions*…."—which "plainly suggest[ed]" that both the first and second sentences of Subsection (B) "provide[] for the imposition of fees and costs as a *sanction* primarily designed not to compensate for legal services but to vindicate First Amendment rights threatened by a kind of 'unwarranted or specious' litigation." 885 F.3d at 671 (citing N.M. Stat. Ann. § 38-2-9.1).

There is no similar textual support in UPEPA. The fee-shifting section of the Act is titled simply "[c]osts, attorney's fees, and expenses; order to show cause,"

suggesting nowhere that an award of fees for a prevailing defendant is meant as a sanction against the plaintiff. If the New Jersey Legislature wanted to condition Subsection (1)'s fee-shifting provision to the dismissal of frivolously filed complaints, it obviously knew how to do so because it included exactly such a provision in Subsection (2) for frivolously filed or bad faith anti-SLAPP motions. N.J.S.A. § 2A:53A-58(2). Instead, Subsection (1) is simply a "mandatory award of attorneys' fees to the prevailing defendant[.]" *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 189 n.24 (S.D.N.Y. 2024) (citation omitted).[9] Thus, treating UPEPA's fee-shifting provision as a sanction "would be contrary to the settled law that [mandatory fee-shifting provisions] are substantive under *Erie*" and "should be followed" in federal diversity cases. *Id.* (quoting *Alyeska Pipeline*, 421 U.S. at 259 n.31).

Failing to apply UPEPA's substantive fee-shifting provision for prevailing movants would be outcome determinative and frustrate the twin aims of *Erie* of

---

[9] There is another reason the Court does not read Subsection (1) to be a procedural sanctions statute. Mandatory anti-SLAPP fee-shifting provisions are not primarily meant to punish; they are meant to change party incentives. And a mandatory fee-shifting provision that changes a party's incentives *is* substantive because it "fundamentally change[s] the nature of [the] cause of action, which is conditioned, qualified, and amplified by [a] quasi-right[] … of action for [] legal costs." *See RLS Assocs., LLC v. United Bank of Kuwait PLC*, 464 F. Supp. 2d 206, 218 (S.D.N.Y. 2006). Subsection (1) changes party incentives because if a plaintiff knows that the pre-trial dismissal of his lawsuit filed against a defendant based on the defendant's speech is subject to fee-shifting, he may think twice before filing. And if a defendant knows that she can recover fees, costs, and expenses related to the filing of an anti-SLAPP motion to dismiss or summary judgment, she is more likely to speak first and later fight a lawsuit targeting her speech. *See* Bruce S. Rosen, *Is It Time for New Jersey to SLAPP Back?*, N.J. LAW. (Oct. 2020) (explaining that "[w]ithout a mandatory fee structure, there is little incentive for many attorneys to take [anti-SLAPP] cases").

discouraging forum shopping and inequity. *Hanna*, 380 U.S. at 468. If UPEPA did not apply in federal court "a litigant interested in bringing meritless SLAPP claims would have a significant incentive to shop for a federal forum. Conversely, a litigant otherwise entitled to the protections of the anti-SLAPP statute would find considerable disadvantage in a federal proceeding." *Newsham*, 190 F.3d at 973; *Godin*, 629 F. 79, 86–87 (holding that "[d]eclining to apply [Maine's anti-SLAPP statute] in federal court would [] result in an inequitable administration of justice between a defense asserted in state court and the same defense asserted in federal court" and encourage forum shopping to avoid liability for a defendant's attorney's fees or costs); *Adelson*, 774 F.3d at 809 (Nevada anti-SLAPP statute "consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity"). Indeed, the state and federal suits would have very different outcomes. *See Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945) ("[T]he outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a [s]tate court."). "Defendants in federal courts would have to pay the expenses of defending meritless SLAPP suits out of their own pockets. Meanwhile, defendants in state court would receive the fees intended for them by their state legislature. This inequitable outcome is exactly what *Erie* and its progeny sought to avoid." *Bobulinski*, 758 F. Supp. 3d at 186 (citing *Hanna*, 380 U.S. at 468)).[10]

---

[10] The Court also finds that there are no countervailing federal interests that would outweigh New Jersey's interest in protecting its citizens First Amendment rights in federal court. *See Schmigel*, 800 F.3d at 119.

### 5.    *Although UPEPA's Fee-Shifting Provision is Substantive, it Cannot be Brought as a Counterclaim*

At the Pre-Motion Conference, the Court queried whether Defendant could assert his request for anti-SLAPP relief as a counterclaim, which he did. [*See* A&C.] Further reflection clarifies that, although UPEPA's fee-shifting provision is a substantive component of state law that can apply in federal court, it cannot be asserted as a counterclaim. Courts in this District have found that, unless expressly authorized by the text of the statute, a fee-shifting provision must be brought by motion rather than as a counterclaim. *Mruz v. Caring, Inc.*, 39 F. Supp. 2d 495, 507 (D.N.J. 1999), *abrogated on other grounds by U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383 (3d Cir. 2002) (dismissing counterclaim for attorney's fees, concluding that "if the New Jersey Legislature intended for a party to be able to recover attorneys' fees under the [New Jersey False Claims Act] by counterclaim, the legislature would have said as much in the text of the statute"); *New Jersey Deer Control, LLC v. En Garde Deer Def., LLC*, 2025 WL 216318, at *4 (D.N.J. Jan. 16, 2025) (holding that fee-shifting provisions of Defend Trade Secrets Act and New Jersey Defend Trade Secrets Act were not independent causes of action and must be pursued through a motion); *see also* FED. R. CIV. P. 54(d)(2)(A) ("A claim for attorney's fees ... must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."). UPEPA, unlike New York's anti-SLAPP statute, for example, does not expressly authorize anti-SLAPP relief as a counterclaim. *See* N.Y. Civil Rights Law § 70-a(1) (affording defendants the right to "maintain an action, claim, cross claim or

counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued [a SLAPP] action."). If Shaulis prevails on a Rule 12(c) motion for judgment on the pleadings or on a Rule 56 motion for summary judgment, he may file an application for attorney's fees under UPEPA.

*    *    *

In sum, while certain provisions of UPEPA conflict with the Federal Rules, its fee-shifting provision—mandating an award of fees, costs, and expenses to a prevailing movant securing dismissal under Rule 12 or Rule 56 against a cause of action implicating his First Amendment speech on a matter of public concern—applies in federal court. That provision does not conflict with the Federal Rules and is substantive for purposes of *Erie*.

### D. Choice of Law Analysis

Seeking to avoid anti-SLAPP relief under New Jersey law, Plaintiffs argue that Maryland law (Paucek's state of domicile) governs Paucek's defamation claims, and Delaware law (PAC's state of incorporation and, allegedly, its principal place of business) governs PAC's defamation and tortious interference claims. Shaulis argues that New Jersey law governs all of the claims in this case. The Court agrees with Shaulis.

When a federal court sits in diversity, it must apply the choice-of-law rules of the forum state, here, New Jersey. *Collins On behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017); *Freedom Mortg. Corp. v. LoanCare, LLC*, 2023 WL 4366288, at *1 (D.N.J. July 6, 2023). "In New Jersey, the first step to resolve a choice-of-law

question turns on 'whether the laws of the states with interests in the litigation are in conflict.'" *Freedom Mortg. Corp.*, 2023 WL 4366288, at *1 (quoting *In re Accutane Litig.*, 194 A.3d 503, 517 (N.J. 2018)). "A conflict of law arises when the application of one or another state's law may alter the outcome of the case, or when the law of one interested state is offensive or repugnant to the public policy of the other." *In re Accutane Litig.*, 194 A.3d at 517 (citations and internal quotation marks omitted). But if the potentially applicable state laws do not actually conflict, "there is no choice-of-law issue to be resolved," and the forum state applies its own law. *Id.* (citations and internal quotation marks omitted).

### 1. *New Jersey, Maryland, and Delaware Law Conflict*

The parties agree that New Jersey, Maryland, and Delaware law conflict. [Def.'s Br. at 21; Pls.' Br. at 6; Def.'s Reply at 9–10.] In addition to certain differences in how those states treat defamation and tortious interference claims generally, [*see* Pls.' Br. at 6–7], anti-SLAPP relief in Delaware and Maryland is far narrower than it is in New Jersey under UPEPA. Maryland's anti-SLAPP statute only applies if the court determines that the plaintiff brought the lawsuit "in bad faith" to "inhibit" the exercise of constitutionally protected free speech or press rights. Md. Code Ann., Cts. & Jud. Proc. § 5-807(b). UPEPA, by contrast, broadly applies to any cause of action based on the defendant's exercise of First Amendment rights on a matter of public concern, regardless of whether the lawsuit was brought in good faith or in bad faith. N.J.S.A. § 2A:53A-50(b)(3). And, unlike UPEPA, Maryland's anti-SLAPP statute does not award costs, attorneys' fees, and expenses to the prevailing party. *Containment*

*Techs. Grp., Inc. v. Am. Soc. of Health Sys. Pharmacists*, 2009 WL 838549, at *6 (S.D. Ind. Mar. 26, 2009) ("Maryland's anti-SLAPP law … makes no provision for attorney fee awards.").

Delaware's anti-SLAPP statute similarly conflicts with UPEPA. Along with Maryland's anti-SLAPP statute, Delaware's anti-SLAPP statute is one of the narrowest in the country, applying only to "actions involving public petition and participation" brought by a "public applicant or permittee." 10 Del. C. § 8136(a); Amy Bresnen, Lisa Kaufman & Steve Bresnen, *Targeting the Texas Citizen Participation Act: The 2019 Texas Legislature's Amendments to A Most Consequential Law*, 52 ST. MARY'S L.J. 53, 59 (2020) (identifying both Delaware and Maryland anti-SLAPP statutes as some of the narrowest in the country). Delaware's anti-SLAPP statute defines "public applicant or permittee" as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body." 10 Del. C. § 8136(a)(2). Given its narrow textual scope, Delaware courts have refused to apply the state anti-SLAPP statute outside of the land use context. *Agar v. Judy*, 151 A.3d 456, 474 (Del. Ch. 2017) ("The text of Delaware's anti–SLAPP statute does not suggest, … that [state legislature] sought to create an expansive shield against any lawsuit brought with an intent to muzzle or inflict retribution for free speech.").

The differences between anti-SLAPP relief in New Jersey, Maryland and Delaware are sufficient to establish a conflict of laws. *Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 607–08 (E.D. Pa. 2018) ("Because New York has

38

an applicable Anti-SLAPP statute and Pennsylvania does not, there is a true conflict in this case that merits further analysis."); *Diamond Ranch Acad., Inc. v. Filer*, 117 F. Supp. 3d 1313, 1320 (D. Utah 2015) (noting differences between California and Utah anti-SLAPP relief and holding that those differences established a conflict of law); *Laboratories, Inc. v. First Databank, Inc.*, 2014 WL 982742, at *5 (M.D. Fla. Mar. 12, 2014) ("genuine conflict" existed between California, New Jersey, and Florida law because California had an anti-SLAPP statute, and latter two states did not). The Court proceeds to the next step of the conflict of laws analysis.

### 2.    *Most Significant Relationship Test*

When competing state laws conflict, New Jersey courts must determine which state has the "most significant relationship" to the claims asserted. *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 455 (2008). The most significant relationship test comes from the Second Restatement of Conflict of Laws. *Id.* (citing Restatement (Second) of Conflict of Laws § 145 (1971) (the "Second Restatement")). The starting point is to identify the Second Restatement's presumptive rule for the specific kind of tort claims asserted in the complaint. *Camp Jaycee*, 962 A.2d at 455. That presumptive rule determines the choice of law outcome unless the general tort principles outlined in Section 145 of the Second Restatement or the general principles regarding competing state interests outlined in Section 6 demand a different result. *Id.* at 455; *Sarver v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016) (applying New Jersey choice of laws principles in defamation and anti-SLAPP action).

a.    *The Presumptive Rule – Section 150*

Section 150 of the Second Restatement applies to multistate defamations involving aggregate communications made over the internet and supplies the presumptive rule for the defamation claims in this case. *Fairfax Fin. Holdings Ltd. v. S.A.C. Cap. Mgmt., L.L.C.*, 160 A.3d 44, 75 (N.J. App. Div. 2017) (applying Section 150 of the Second Restatement to multistate defamation claim involving aggregate communication). It also supplies the presumptive rule for PAC's tortious interference claims. *See Aleynikov v. The Goldman Sachs Grp., Inc.*, 2016 WL 6440122, at *10 (D.N.J. Oct. 28, 2016) (assuming that Section 150 of the Second Restatement would have applied to tortious interference claim but finding that communication did not disseminate injurious falsehood by aggregate communication).[11]

The presumptive rule under Section 150 is to apply "the local law of the state which … has the most significant relationship to the occurrence and the parties" which, for a natural person, like Paucek, will usually be his state of domicile because that state is where he will have "suffered the greatest injury by reason of his loss of reputation." *Id.* § 150(1)–(2); *id.* cmt. e. And for a corporate entity, like PAC, it will

---

[11]   The tortious interference claim also fits within Section 151 of the Second Restatement governing torts of "injurious falsehood." *See Ranbaxy Lab'ys, Inc. v. First Databank, Inc.*, 2014 WL 982742, at *5 (M.D. Fla. Mar. 12, 2014) ("In tortious interference … cases, the closest choice of law provision, and therefore the applicable provision, is that relating to defamation and injurious falsehoods."). But because the choice of law rules for injurious falsehood "are the same as those involving defamation," Section 150 still provides the presumptive rule. *See* Restatement (Second) of Conflicts § 151; *id.* cmt. c (explaining that "[w]hen an aggregate communication involving injurious falsehood is published to third persons in two or more states," the presumptive rule of Section 150 applies).

usually be the state where it has its principal place of business, the state where the corporation's "reputation will [] be most grievously affected." *Id.* § 150(3); *id.* cmt. f.

Nobody disputes that Paucek is a Maryland domiciliary or that Shaulis is a New Jersey domiciliary. [Compl. ¶¶ 6, 8.] So, the presumptive rule under Section 150 of the Second Restatement would be to apply Maryland law to his defamation claims. There is a dispute, however, regarding the location of PAC's principal place of business.

In his reply brief, Shaulis cites a PAC SEC Item 06b filing, signed by Paucek, identifying PAC's principal place of business as Miami Beach, Florida, not Wilmington, Delaware, as pleaded in the Complaint and represented in PAC's motion papers. [Reply Br. at 2–6 (citing PAC, Notice of Exempt Offering of Securities (Item 06b) (Jan. 7, 2025)).] Shaulis accuses Plaintiffs of intentionally concealing and misrepresenting PAC's principal place of business to avoid application of Florida's anti-SLAPP statute which, like UPEPA, applies broadly in any case involving "speech in connection with public issues." [Reply Br. at 6 (citing Fla. Stat. § 768.295).] Recall that Delaware's anti-SLAPP statute applies in far more limited circumstances that UPEPA does. 10 Del. C. § 8136.

The day after Shaulis filed his reply brief, PAC amended its Item 06b filing to reflect that Delaware, not Florida, is the company's principal place of business. [Docket No. 41-1 ("Rutkowski Decl."), Ex. A (PAC, Amended Notice of Exempt Offering of Securities (Item 06b) (Feb. 20, 2025)).] Plaintiffs sought leave to file a sur-reply to explain the discrepancy which the Court, in its discretion, permitted. *Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014) (permission for leave

41

to file sur-reply rests within a district Court's "sound discretion"); L. CIV. R. 7.1(d)(6). Relying on sworn declarations from Paucek, Kaleb Thornhill (PAC's co-CEO), and an associate attorney from Cooley LLP—which serves as PAC's corporate counsel— PAC reaffirms that its principal place of business is Wilmington, Delaware, not Miami Beach, Florida. [Sur-Reply at 2 (citing Docket Nos. 41-7 ("Paucek Decl."), 41-6 ("Thornhill Decl."), 41-8 ("Burton Decl.").] PAC attributes the error to a Cooley paralegal mistakenly using the address for Paucek's Miami Beach vacation condo to prepare the filing rather than PAC's Wilmington, Delaware office address. [Sur-Reply at 3 (citing Burton Decl. ¶ 3).] It notes that in its prior Item 06b filings with the SEC, PAC has always accurately listed its Wilmington office as its principal place of business. [*Id.* (citing Burton Decl. ¶ 4); Rutkowski Decl., Ex. B, PAC, Notice of Exempt Offering of Securities (Item 06b) (Aug. 4, 2024)).]

Putting aside how weak it is to blame a paralegal, supervised by partners and associates at a major law firm, for a mistake that Paucek signed off on, the Court's standard for determining a corporation's principal place of business is not where the corporation says it has its principal place of business in its public regulatory filings. *See Hertz Corp. v. Friend*, 559 U.S. 77, 97 (2010) (rejecting suggestion that the "mere filing of a[n] [SEC] form" listing a corporation's "principal executive offices" could establish principal place of business); *Aizen v. Am. Healthcare Admin. Servs., Inc.*, 2019 WL 4686811, at *7 (D.N.J. Sept. 26, 2019) (company's principal place of business "does not depend on what address a company lists when filing government forms or what address the company provides to members of the public"). Instead, a corporation's

principal place of business is its "nerve-center," "the place where [its] officers direct, control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 80–81. Usually, that place is the corporation's headquarters, but only "provided that the headquarters *is the actual center of direction, control, and coordination*," and not simply a "bare office" with "a mail drop box" and a "computer" or the "location of [the company's] annual executive retreat." *Id*. at 93, 97 (emphasis added).

Wherever that place is for PAC, it is not in Delaware. Outside of PAC's representations that it has a single corporate office in Delaware where it receives mail, [Sur-Reply at 2 (citing Paucek Decl. ¶¶ 5, 7; Thornhill Decl. ¶¶ 5–8)], it has presented no evidence supporting the conclusion that the office is anything more than a mail drop box, maybe with a computer. Indeed, none of its executives with decision-making authority to direct, control, and coordinate PAC's activities work in Delaware. [*Id*. (citing Paucek Decl. ¶¶ 2, 6; Thornhill Decl. ¶¶ 4, 6–7).]. Paucek works out of his Annapolis, Maryland home approximately 80% of the time. [Paucek Decl. ¶ 6.] And when he is vacationing in Florida, he works out of his Miami Beach condo. [*Id*.] Thornhill lived in Florida until July 2022, [Thornhill Decl. ¶ 6], but has since moved to, and now works from Texas, [*id*.]. And PAC's COO resides in and works from Michigan, and its CFO resides in and works from North Carolina. [*Id*. ¶ 4.] None of PAC's non-executive employees work in the Delaware office either. [*Id*. ¶ 3 (stating that PAC employees work remotely across nine states, none of which are Delaware).]

Given the diffuse nature of PAC's executive operations, determining where its principal place of business is makes this one of the "hard cases" predicted by the

43

Supreme Court in *Hertz* where—especially in the post-COVID era of Zoom meetings and remote work—"some corporations may divide their command and coordinating functions among officers who work at several different locations … over the Internet." *Hertz*, 559 U.S. at 95–96. Confronted with these circumstances, courts have considered the domiciles of a corporation's key decision-making executives to determine its principal place of business. *Colmenares v. Paedae, Inc.*, 2021 WL 4934976, at *4 (C.D. Cal. Oct. 22, 2021) (determining that corporation's principal place of business with scattered executives and employees was state where "plurality of its officers with strategic, decision-making, and financial authority" were located); *Aizen*, 2019 WL 4686811, at *6 (finding corporate nerve center to be state where CEO reports to work); *Pool v. F. Hoffman-La Roche, Ltd.*, 386 F. Supp. 3d 1202, 1221 (N.D. Cal. 2019) (CEO's governance role highly significant to determining location of corporation's principal place of business). But that only helps a little bit. Paucek and Thornhill are co-CEOS and "share responsibilities in corporate decision-making on behalf of PAC, along with other members of PAC's executive team," neither of whom reside in Maryland, Florida, or Delaware. [Paucek Decl. ¶ 4; Thornhill Decl. ¶ 4.]

The Court in conducting its choice of law analysis declines to make a definitive finding regarding PAC's principal place of business. *Cf. Sarver*, 813 F.3d at 898 (conducting Restatement Second Section 150 analysis and declining to determine domicile of plaintiff who "provided little support for his contention" that he was a New Jersey domiciliary). Every corporation has one single principal place of business. *See Hertz*, 559 U.S. at 93 (corporate nerve center is a single place). But there is simply

not enough evidence in the record for the Court to make an authoritative determination and the Court will not engage in guesswork. It is clear, however, that PAC's principal place of business is not in Delaware.[12]

**b.    *The General Tort Principle – Section 145***

The Court next considers the factors enumerated in Section 145 of the Second Restatement, which presents the general choice of law rule informing all torts. *See Camp Jaycee*, 962 A.2d at 458, 461–63. Those factors are "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Id.* at 458 (quoting Restatement (Second) of Conflicts § 145(2)(a)–(d)).

First, the place where the injury occurred does not weigh strongly in favor of any state. Paucek's injury occurred in Maryland because that is where he is domiciled. And PAC says its injury occurred in Delaware, where it alleges (without any real support) that its principal place of business is located and where it is incorporated. But the injuries also occurred in every other state where the Allegedly Defamatory Statements were published. As the Ninth Circuit explained in *Sarver*, "it is difficult to identify, let alone place great weight upon, the location of [Plaintiffs'] alleged injury" because the Alleged Defamatory Statements were "distributed nationwide" over the

---

[12] And, as in *Sarver*, even if the Court were to find that PAC's principal place of business was in Delaware (or somewhere else), the Section 145 general tort principles and Section 6 state interest factors, as explained below, weigh in favor of applying New Jersey law—Shaulis's state of domicile.

45

internet, creating injury in multiple states. 813 F.3d at 899–900. Any reputational injury suffered by PAC and Paucek no doubt occurred in Maryland where Paucek resides and Delaware where PAC is incorporated. But these injuries, as Plaintiffs admit, also occurred in Florida and Texas where Paucek and PAC do significant business. [Compl. ¶ 19 (describing PAC's programming with the University of Miami); Thornhill Decl. ¶¶ 2–3 (describing PAC's "business combines" held in Florida, Texas, and New York and the scheduling of anticipated business combines in Colorado, Illinois, and Georgia); Pl's Br. at 12 ("Shaulis's posts were directed to PAC's existing and potential clients and business partners, as well as conduct, in Texas and Florida.").] As explained by the Second Restatement's commentary, there is "little reason in logic or persuasiveness to say that one state rather than another is the place of injury" when a "multistate defamation injury has occurred in two or more states." Restatement (Second) of Conflicts § 145 cmt. e (citing § 150).

Second, the place where the conduct causing the injury occurred weighs in favor of an application of New Jersey law. The Alleged Defamatory Statements were written in New Jersey, Shaulis's state of domicile. Although in multistate defamation cases the place of the defendant's conduct is of less significance, *see* Restatement (Second) of Conflicts § 145 cmt. e, because the injury occurred in two or more states, the state of the defendant's domicile is afforded more weight, *id*.

Third, the domicile, residence, nationality, place of incorporation and place of business of the parties favors Maryland law only slightly with respect to Paucek's claim and does not favor any one state with respect to PAC's claims. Paucek is a Maryland

domiciliary and there is little doubt the Alleged Defamatory Statements affect his reputation in the Old Line State. But he also has a reputation to uphold in the states where PAC actually does business, like Florida and Texas. That cuts against an application of Maryland law. *See* Restatement (Second) of Conflicts § 150 cmt. e (noting that presumptive rule of Section 150 may not apply where plaintiff is better known in a state other than his state of domicile). And although there is no doubt that Delaware is PAC's state of incorporation, that is a relatively weak factor for purposes of the most significant relationship test, especially where the corporation, as here, "does little or no business" in its state of incorporation. *See* Restatement (Second) of Conflicts § 145 cmt. e.

Fourth, the place where the relationship, if any, between the parties is centered is neutral. Shaulis and Paucek appear to have no relationship with one another.

### c.  *The State Interest Factors – Section 6*

Finally, the Court considers the state interest factors outlined in Section 6 of the Second Restatement. These factors, distilled by the New Jersey Supreme Court, are: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 962 A.2d at 463 (citing Restatement (Second) of Conflicts § 6(2)). The combined effect of this analysis "focus[es] primarily on the interests of the [competing] states" and interests of interstate comity. *Sarver*, 813 F.3d at 899 (quoting Peter Hay, Patrick J. Borchers & Symeon C. Symeonides, *Conflict*

*of Laws* 888 (5th ed. 2010)); *Fu v. Fu*, 733 A.2d 1133, 1141 (N.J. 1999) (interests of the competing states is "the most significant" Section 6 factor)).

Courts across the country, including the Ninth Circuit in *Sarver*, have found that substantial differences in state treatment of anti-SLAPP relief may defeat the Section 150 presumption. *See Sarver*, 813 F.3d at 897–900 (overriding presumptive rule and applying California law because, *inter alia*, New Jersey did not have an anti-SLAPP statute at the time); *Evans v. TheHuffingtonPost.com, Inc., C.A.*, 2023 WL 5275383, at *3–5 (D. Del. Aug. 16, 2023), *aff'd on other grounds*, 2024 WL 3949070 (3d Cir. 2024) (overriding presumptive rule and applying New York law because, *inter alia*, Mississippi did not have an anti-SLAPP statute); *Woods Servs., Inc.*, 342 F. Supp.3d at 607–08 (overriding presumptive rule and applying New York law because, *inter alia*, Pennsylvania did not have an anti-SLAPP statute at the time). As discussed, New Jersey's anti-SLAPP statute differs substantially from the narrow anti-SLAPP relief available in Maryland and Delaware. UPEPA applies broadly to any cause of action based on the defendant's exercise of First Amendment rights on a matter of public concern and a defendant can shift fees and costs if he prevails on a Rule 12 or Rule 56 motion. N.J.S.A. §§ 2A:53A-50, 2A:53A-58.

UPEPA's broad application would be frustrated if Maryland or Delaware law instead applied. Maryland's anti-SLAPP statute does not permit a prevailing party to secure fees, one of the "most important features" of anti-SLAPP legislation to deter abusive SLAPP lawsuits. White, *supra*, at 582. And Delaware's anti-SLAPP statute only applies in land-use cases rather than, as here, with respect to speech on matters

48

of public concern. By enacting a fulsome anti-SLAPP statute, New Jersey's Legislature has expressed a strong interest in "protect[ing] people from meritless lawsuits intended to intimidate them for exercising their free speech rights." *See* N.J. Governor's Message, *supra*. That strongly articulated interest is entitled to significant weight.

Plaintiffs resist the conclusion that UPEPA's more robust anti-SLAPP protections calls for an application of New Jersey law in this case. They distinguish *Sarver* and other cases overriding the Section 150 presumptive rule on the ground that, in those cases, the courts were not, as here, choosing between state laws with differences in their anti-SLAPP statutes. [Pls.' Br. at 14–15.] Rather, those courts, they argue, were choosing between a state *with* an anti-SLAPP statute and a state *without* an anti-SLAPP statute. [*Id.*]

That is a distinction without any real difference, however. The choice between a state affording some anti-SLAPP relief and a state affording no anti-SLAPP relief is not materially different than the choice between a state affording strong anti-SLAPP relief (as UPEPA does), and a state affording weaker anti-SLAPP relief (like Maryland and Delaware do). In *Sarver*, the Ninth Circuit, overriding the Section 150 presumptive rule, acknowledged that even though New Jersey had not yet passed an anti-SLAPP statute, New Jersey courts still recognized that SLAPPs "require some level of 'counteraction.'" 813 F.3d at 891 (quoting *LoBiondo v. Schwartz*, 733 A.2d 516, 533 (N.J. App. Div. 1999)). Therefore, it found, that "the interests of interstate comity and the competing interests of the states tilt[ed] in favor of applying California law," the defendant's state of domicile (and which has a strong anti-SLAPP law on the books),

49

because "[w]hereas California would appear to object strongly to the absence of a robust anti-SLAPP regime, New Jersey's interests would be less harmed by the use of California law." *Sarver*, 813 F.3d at 899–900.

Similarly, here, Maryland and Delaware agree that some level of anti-SLAPP protection is necessary. But New Jersey believes that broader anti-SLAPP relief than that afforded by the Maryland and Delaware statutes is necessary. So, as in *Sarver*, applying New Jersey's more protective statute would be less frustrating to Maryland and Delaware interests than applying those States' weaker anti-SLAPP statutes here in New Jersey. *See Jankowski v. Sandor*, 2011 WL 3107763, at *6 (N.J. Super. Ct. App. Div. July 27, 2011) ("When one state's laws are stricter than the other state's, applying the more relaxed law interferes with the policies of the stricter state, and undermines uniformity and predictability of judicial administration.") (citing *Cornett v. Johnson & Johnson*, 998 A.2d 543, 553 (N.J. App. Div. 2010), *aff'd as modified*, 48 A.3d 1041 (2012)). That is especially so given that the allegedly defamatory speech originated in New Jersey, which "has a strong interest in having its own anti-SLAPP law applied to the speech of its own citizens … initiated within [its] borders." *Chi v. Loyola Univ. Med. Ctr.*, 787 F. Supp. 2d 797, 803 (N.D. Ill. 2011); *Diamond Ranch*, 117 F. Supp. 3d at 1324 (same).

Plaintiffs protest that elevating UPEPA over anti-SLAPP statutes passed by Maryland and Delaware would improperly reject the legitimate balance that those States' legislatures decided was appropriate in dealing with SLAPPs. [Pls.' Br. at 15.] But that argument undercuts Plaintiffs' proposed distinction. Choosing between a state

50

law with an anti-SLAPP statute on the books and a state law without an anti-SLAPP statute on the books, as in *Sarver*, still elevates one state's decision to afford anti-SLAPP relief over another state's decision, perhaps deliberately, *not* to afford anti-SLAPP relief.

The Court finds that the remaining Section 6 factors are either neutral (the parties' interests and the interests underlying the field of tort law) or favor New Jersey law (interests of judicial administration). With respect to the latter, which requires courts to examine "practicality and ease of application, factors that in turn further the values of uniformity and predictability," *Camp Jaycee*, 962 A.2d at 467, a New Jersey court applying New Jersey tort law against a New Jersey citizen for his conduct in New Jersey would be in the best interest of judicial administration. "New Jersey has a strong interest in regulating its citizens' wrongful conduct within this state, *Freedom Mortg. Corp.*, 2023 WL 4366288, at *6, and this Court is familiar with applying New Jersey tort law when sitting in diversity. *Days Inns Worldwide Inc. v. S&S Airport Hotel, LLC*, 2024 WL 1612324, at *4 (D.N.J. Apr. 15, 2024) (noting that courts in this Judicial District are "routinely called on to apply New Jersey law" and are "familiar" with New Jersey law).

*    *    *

Although it is a somewhat close question, the Court finds that New Jersey law should govern the claims in this case. Delaware law does not apply to PAC's claims because it failed to offer sufficient proof that its principal place of business is in Delaware and, even if it did, the Court finds no other convincing reason to apply

51

Delaware law over New Jersey law. And although Maryland has some interest in having its law apply to Paucek's claims, the Section 145 and Section 6 factors flip the Section 150 presumption in Shaulis's favor.

## V.    CONCLUSION

For the foregoing reasons, the Court holds that (i) New Jersey's anti-SLAPP law affords fees, costs, and expenses to a prevailing movant who successfully dismisses a SLAPP suit under Federal Rule 12 or Federal Rule 56; and (ii) New Jersey law governs the claims in this case. An appropriate Order shall issue.


**May 6, 2025**                                  **s/Renée Marie Bumb**
Date                                                   RENÉE MARIE BUMB
                                                          Chief United States District Judge