[Docket No. 47]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

CHRISTOPHER PAUCEK, A.K.A.
CHIP, and PRO ATHLETE
COMMUNITY, INC.,

          Plaintiffs,

    v.

DAHN SHAULIS,

          Defendant.

Civil No. 24-9807 (RMB-AMD)

**OPINION**

**RENÉE MARIE BUMB, Chief United States District Judge**

I.　　　**INTRODUCTION**

This matter comes before the Court upon a Motion for Judgment on the Pleadings (the "Motion") filed by Defendant Dahn Shaulis. [Docket No. 47 ("Def. Br.").] Plaintiffs Christopher "Chip" Paucek and his company Pro Athlete Community, Inc. ("PAC," collectively "Plaintiffs") have opposed the motion [Docket No. 50 ("Pls. Br.").] Defendant submitted a reply in further support of his motion, [Docket No. 55], and both parties submitted supplemental briefs following oral argument. [Docket Nos. 63, 64.] The Court has carefully considered the parties' submissions and arguments made during oral argument. [Docket Nos. 61-62.] For the reasons set forth below, the Court will **DENY** Defendant's Motion, **without prejudice**, and proceed with limited discovery as to whether the topic of Shaulis'

speech touched on a matter of public concern and the extent of business harm, if any, PAC suffered as a result of Shaulis' posts.

## II.     FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Chip Paucek, a tech CEO, and his company, PAC, Inc., bring suit against Defendant Dahn Shaulis, a blogger, for calling Paucek a "consummate con man" and putting his audience on a "scam alert" with respect to Paucek and his company. The Court incorporates the factual background and procedural history as outlined in its prior Opinion and recites herein only those facts necessary to resolve Shaulis' Motion for Judgment on the Pleadings. *See Paucek v. Shaulis*, 349 F.R.D. 498 (D.N.J. 2025).

### a.  Paucek's Experience in the Education Sector

Paucek has an extensive history of serving as the CEO of multiple educational companies including Cerebellum, Smarterville, Inc—the parent company of Hooked on Phonics—and 2U, Inc. [Compl. at 4.] By 2018, 2U was "the nation's leading provider of software for universities" and named Harvard, Yale, Georgetown, and the University of Southern California as some of their partner schools. [*Id.* at 5.] However, come early 2020, 2U "incurred significant net losses" and was "uncertain about [its] future profitability." *See* 2U, Inc., Annual Report (Form 10-K) (Feb. 27, 2020). Shortly

---

[1] The Court draws the following factual background from the allegations in the parties' pleadings. [Docket No. 1 ("Compl."); Docket No. 25, Amended Answer and Counterclaim ("A&C")]; *Aruai v. Mallozzi*, 2014 WL 3600482, at *5 (E.D. Pa. July 21, 2014) (considering articles referenced in pleadings); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007) (District court entitled to take notice of full contents of published articles referenced in pleadings under Federal Rule of Evidence 201).

thereafter, its stocks plunged. [A&C ¶ 145.] In an unsuccessful effort to recuperate some of the lost value, 2U took on severe debt acquiring other online platforms. [A&C ¶ 144 (citing Melissa Korn, The Long, Steep Fall of an Online Education Giant, WALL STREET J. (May 12, 2024), https://www.wsj.com/us-news/education/education-technology2u-debt-e7218eeb).]

2U faced extreme backlash from students and investors alike. A class action lawsuit was filed against 2U alleging it had misled its investors as to the company's projected success. [A&C ¶ 122-29.] A judge in the District of Maryland found that the plaintiffs in that matter adequately alleged that Paucek omitted disclosing the declining enrollment projections with scienter. [A&C ¶ 122 (citing *In re 2U, Inc. Sec. Class Action*, 2021 WL 3418841, at *31–41, 51–57 (D. Md. Aug. 5, 2021).] Ultimately, 2U settled the lawsuit for $37 million. [A&C ¶ 130 (citing *In re 2U, Inc. Sec. Class Action*, No. 8:19-cv-3455 (TDC), Docket No. 224-3 (D. Md. June 2, 2022) (stipulation and agreement of settlement)); *id.* ¶¶ 131, 146.]

In 2021, the Wall Street Journal published an article stating that 2U aggressively recruited students who would not otherwise qualify for equivalent in-person programs and could not afford the tuition resulting in their taking on significant debt, only to obtain low paying jobs upon graduation. [*See* A&C ¶ 144 (citing Lisa Bannon & Melissa Korn, USC Pushed a $115,000 Online Degree. Graduates Got Low Salaries, Huge Debts, WALL STREET J. (Nov. 9, 2021), https://www.wsj.com/articles/usc-online-social-work-masters-11636435900).] Some students also sued 2U and the University of Southern California, although 2U was dismissed in 2023. *See Favell v.*

*Univ. of S. California*, 2024 WL 751006 (C.D. Cal. Jan. 23, 2024). Shortly thereafter, Paucek resigned as CEO. [A&C ¶ 151.]

### b. Pro Athlete Community, Inc.

After stepping down from 2U, Paucek co-founded PAC, of which he is currently co-CEO. [Compl. at 5.] Unlike 2U, PAC seeks to serve the professional athlete community following the conclusion of their athletic careers through "education, training, mentorship, networking, and other support." [*Id.*] PAC boasts enrollment from over 350 former athletes from various professional leagues including the National Football League ("NFL") and Major League Baseball ("MLB"). [*Id.* at 6.]

### c. Shaulis' Posts Regarding Paucek and PAC

Shaulis has a clear deep-seated dislike of Paucek and strong skepticism of PAC. Shaulis has paid close attention to Paucek's career over the years and spoken with several people who had previously been engaged in business relationships with Paucek. [A&C at 117-19.] On June 25, 2024, Shaulis (username @USinjustice) replied to a since deleted post on X stating:

> Jason, you guys in Miami need to investigate Chip Paucek
> and his latest scheme, Pro Athlete Community. Chip was
> the consummate con man with Hooked on Phonics and 2U.

[Compl. at 9; Compl., Ex. A (the "X Post").]

A few months after the X post, Shaulis wrote the following on his blog, Higher Education Inquirer ("HEI"):

> **SCAM ALERT: Chip Paucek and Pro Athlete Community (aka PAC)**
>
> [HEI] is conducting an extensive investigation of former 2U CEO Chip Paucek. While we are compiling and analyzing this information, HEI is putting out a warning to current and former professional athletes who may be contacted by Paucek's newest enterprise, [PAC].
>
> As the co-CEO of [PAC], Chip Paucek rang the opening bell at NASDAQ on June 13, 2024, just months after driving another company, 2U, to near failure.
>
> [PAC] is recruiting former professional athletes to become members, offering dreams of success. A number of former NFL players have already signed up and are being used to sell PAC's services.
>
> . . .
>
> From September 14–19, in Austin, Texas, PAC is holding live sessions to sell their dreams. The event is called Next Chapter U. They are also working with the University of Miami's Herbert School of Business on a certificate program for PAC members.
>
> We encourage those who have been contacted by [PAC] to do their due diligence, given Paucek's track record as an unethical businessperson.
>
> We are also asking those who have been contacted to document any material statements made, to consult their lawyers, and to let us know what promises may be said on the back stage. We will share with you what we know.

[Compl. 9; Compl., Ex. B (the "First HEI Post").]

Following the First HEI Post, Plaintiffs' lawyers served Shaulis with a cease-and-desist letter. [Compl. at 13.] The letter demanded that Shaulis (1) remove the First HEI Post, which he complied with; (2) issue a statement retracting the post and stating

that it was false; and (3) make no further false or misleading statements about Paucek

or PAC. [*Id.*]

A few days later, when Plaintiffs' counsel contacted Shaulis inquiring about the

other two demands, Shaulis informed them that he would only retract his statements

if he could state that he was doing so under coercion and that the First HEI Post was

based in fact. [*Id.*] Plaintiffs declined these terms. [*Id.*]

Shaulis then posted again on HEI the next day:

> **HEI Receives Cease-and-Desist Letter from Chip Paucek's Lawyers**
>
> [HEI] has received a cease-and-desist letter from lawyers representing Chip Paucek and [PAC]. Out of respect for PAC co-CEO Kaleb Thornhill and members of PAC, we have removed the article. However, we stand by all the facts of the story and our characterization about Mr. Paucek, the former CEO of 2U and Smarterville (aka Hooked on Phonics). These characterizations are based on information and opinions obtained from experts in the education business in addition to publicly available business records and government records [including] earnings call transcripts, consumer lawsuits, and citizen/consumer testimony.

[*Id.* at 13-14; Compl., Ex. C (the "Second HEI Post" and, together with the First HEI

Post and the X Post, the "Alleged Defamatory Statements").] This lawsuit followed

shortly thereafter.

Shaulis filed the instant motion on May 21, 2025. [Docket No. 47.] The matter

was fully briefed by the parties and the Court held oral argument on August 12, 2025,

in which both parties were granted leave to file supplemental briefs on the necessity of discovery. [Docket No. 61-62.] Both parties have submitted their briefs, and the issue is now ripe to be determined. [Docket Nos. 63, 64.]

III.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "A motion for judgment on the pleadings under Rule 12(c) 'is analyzed under the same standards that apply to a Rule 12(b)(6) motion.'" *Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (quoting *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)). Thus, to succeed on a motion for judgment on the pleadings, a movant must show "there are no material issues of facts, and he is entitled to judgment as a matter of law." *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017). When deciding a motion for judgment on the pleadings, a court must accept the nonmoving party's factual allegations as true and draw all reasonable inferences in its favor. *Id.* at 418.

IV.     ANALYSIS

This Court has already determined the threshold issue that New Jersey substantive law governs this matter while Federal Procedure remains in place. *See Paucek v. Shaulis*, 349 F.R.D. 498 (D.N.J. 2025). Summary judgment is a procedural function of the court, not substantive, and therefore is not concerned with the spirit of a particular statute itself but rather looks to the facts alleged. *See* Fed. R. Civ. P. 56. As

discussed below, there are several remaining genuine issues of material fact in this matter that the Court cannot dispose of at this stage. [*See infra* A, B.] While the Court acknowledges the persuasiveness of Shaulis' argument as to the intent behind the UPEPA as it relates to discovery, the Court must ultimately disagree. Under the Federal Rules of Civil Procedure, which govern this matter, such disputes must proceed to discovery. *See Paucek*, 349 F.R.D. 498; Fed. R. Civ. P. 56.

### A.    Defamation – Counts I and II

To succeed on their defamation claims, Plaintiffs must prove that Shaulis: (1) made false and defamatory statements concerning Plaintiffs; (2) made such statements to a third party; and (3) acted negligently or with actual malice. *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011). When the allegedly defamatory speech concerns a public figure, public official, or involves a matter of public concern, the higher actual-malice standard applies. *See Senna v. Florimont*, 958 A.2d 427 (N.J. 2008).

The actual-malice standard requires proof that the defamatory statement was published "with knowledge that it was false or with reckless disregard" of its truth or falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). If the speech involves a matter of public concern not only does the actual malice standard apply, but it also triggers New Jersey's anti-SLAPP statute ("UPEPA.") N.J.S.A. § 2A:53A-50(b)(3) (UPEPA applies to defendant's "exercise of the right of freedom of speech or [ ] press . . . guaranteed by the United States Constitution or the New Jersey Constitution, on a matter of public concern.").

"[P]ublished investigative reports by media and media-related defendants" are practically always matters of public concern. *See Senna v. Florimont*, 958 A.2d 427, 496–97 (2008). "In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech." *Id.* at 497 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761–62 (1985)). "Content requires that [the court] look at the nature and importance of the speech" and determine if, for instance, the speech "promote[s] self-government or advance[s] the public's vital interests" as opposed to if it "predominantly relate[s] to the economic interests of the speaker." *Id.* "Context requires that [the court] look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience." *Id.* The New Jersey Supreme Court has "sa[id] for certain" that "[d]iscourse political subjects and critiques of the government will always fall within the category of protected speech that implicates the actual-malice standard" and so will discourse "concerning significant risks to public health and safety." *Id.*

"On the other hand, there is no great societal benefit or higher free speech value in providing heightened protection for the defamatory and false statements uttered by one business competitor against another. That form of commercial speech, generally, will call for the application of the negligence standard." *Id.*

### a. Shaulis' Statements

Shaulis argues that his statements made via social media constitute non-actionable opinions and rhetorical hyperbole, not defamatory facts. [Def. Br. at 8.]

9

Paucek disagrees and instead believes Shaulis' statements were defamatory *per se*, or in the alternative, actionable mixed opinions. [Pls. Br. at 8, 13.]

A statement is defamatory if it "subjects an individual to contempt or ridicule" or "harms a person's reputation . . . by deterring others from wanting to associate or deal with him . . . ." *G.D. v. Kenny*, 15 A.3d 300, 310 (N.J. 2011). Whether a statement is defamatory is a fact-specific inquiry and requires an analysis of "(1) the content, (2) the verifiability, and (3) the context" of the allegedly defamatory statement. *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1113 (N.J. 2009). If the statement is *per se* defamatory, as Plaintiffs alleged, they would need not prove actual damages. *W.J.A. v. D.A.*, 43 A.3d 1148, 1154 (2012).

"In order to evaluate a statement's content, a court must consider 'the fair and natural meaning that will be given to the statement by reasonable persons of ordinary intelligence.'" *Leang*, 969 A.2d at 1114 (quoting *DeAngelis v. Hill*, 847 A.2d 1261, 1268 (N.J. 2004)). Although it can be hurtful, "name-calling does not have a defamatory content such that harm to reputation can be shown. The First Amendment does not embrace the trite wallflower politeness of the cliche that 'if you can't say anything good about a person you should say nothing at all.'" *Ward v. Zelikovsky*, 643 A.2d 972, 979 (N.J. 1994) (citation and internal quotation marks omitted).

To determine whether a statement's content is defamatory, courts must discern "between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." *Id.* at 979 (citation

10

and internal quotation marks omitted). "When considering verifiability, a court must determine whether the statement is one of fact or opinion." *Id.* (citation and internal quotation marks omitted). Only factual statements are capable of verification; they are either true or false. Statements of opinion are not capable of such verification as they reflect the speaker's state of mind and "[u]nder the First Amendment, there is no such thing as a false idea." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).

However, a statement of opinion may be actionable where it "implies underlying objective facts that are false." *Id.* (citing *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–20 (1990)). This type of statement constitutes a "mixed" opinion that is "apparently based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication." *Kotlikoff v. The Cmty. News*, 444 A.2d 1086 (N.J. 1982).

For a plaintiff to prevail on claims based upon such mixed opinions, the underlying or implied facts must be untrue. "[L]oose figurative or hyperbolic language" "will be less likely to imply specific facts, and thus more likely to be deemed non-actionable as rhetorical hyperbole or a vigorous epithet." *Milkovich*, 497 U.S. at 17; *Ward*, 643 A.2d at 980. Simply put, "[t]he higher the fact content of a statement, the more likely that the statement will be actionable." *Ward,* 643 A.2d at 979.

To evaluate a statement's context, courts must "consider the impression created by the words used as well as the general tenor of the expression, as experienced by a reasonable person." *Id.* (citation and internal quotation marks omitted). Courts should

11

also consider the forum in which the speaker made the statement as part of the overall context. *Jevremovic v. Courville*, 2023 WL 5127332, at *5 (D.N.J. Aug. 10, 2023) (Applying New Jersey law).

This matter relies heavily upon the context surrounding Shaulis' statements. The Court disagrees with Paucek's first categorization of the Alleged Defamatory Statements as *per se* defamation as it is likely a reasonable user on X would "expect to find many more opinions than facts" on the platform and have construed Shaulis' statement that Paucek is a "consummate con man" as such. [Compl., Ex. A.]; *Broughty v. Bouzy*, 2023 WL 5013654, at *5 (D.N.J. Aug. 7, 2023); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) (concluding that stating that the plaintiff "engaged in extortion, manipulation, fraud, and deceit is a vague statement . . . of the loose, figurative, or hyperbolic sort that is not actionable for defamation"). Whether Paucek is or is not a "consummate con man" is not capable of being true or false but whatever facts Shaulis relied upon to draw such a conclusion may be.

Turning to the First HEI Post, there do appear to be undisclosed facts forming Shaulis' opinion that Paucek has a "track record as an unethical businessperson" so much so that he felt the need to put his audience on "scam alert." [Compl., Ex. B.] He also offered to "share . . . what we know" with PAC's potential clients and business associates if they provided him with details of their conversations with Plaintiffs. [*Id.*] Such a statement is an express offering of factual support he was purporting to possess,

yet choosing to withhold. [*Id.*] As there appears to be at least some undisclosed facts embedded in Shaulis' statements of opinion, the matter must proceed to limited discovery to uncover the factual basis on which Shaulis' speech relies.

### b. Applicability of the Actual Malice Standard and the UPEPA

Shaulis argues that, due to the content being of public concern, his speech is protected by the First Amendment, entitling him to the protections afforded by the UPEPA. [Def. Br. at 27.] For the UPEPA to apply, the speech must pertain to an area of public concern, triggering the additional element of actual malice in a defamation consideration. N.J.S.A. § 2A:53A-50(b)(3). Paucek disagrees, however, and does not claim that he is a public figure nor that any aspect of Shaulis' alleged defamatory posts touch on a matter of public concern. [Pls. Br. at 16, 19.]

"[P]ublished investigative reports by media and media-related defendants" are practically always matters of public concern. *See Senna v. Florimont*, 958 A.2d 427, 496–97 (2008). "In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech." *Id.* at 497 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761–62 (1985)).

Since this Court's prior Opinion in this matter, New Jersey courts have provided further guidance as to the interpretation and limitations of the UPEPA, reiterating that

its protections *only* extend to speech pertaining to "matter[s] of public concern." *Satz v. Starr*, 482 N.J. Super. 55, 64 (N.J. App. Div. 2025). The New Jersey Supreme Court has also "sa[id] for certain" that "[d]iscourse[,] political subjects[,] and critiques of the government will always fall within the category of protected speech that implicates the actual-malice standard" as will discourse "concerning significant risks to public health and safety." *Id.* "On the other hand, there is no great societal benefit or higher free speech value in providing heightened protection for the defamatory and false statements uttered by one business competitor against another. That form of commercial speech, generally, will call for the application of the negligence standard." *Id.*

The crux of Shaulis' argument as to why his speech addresses an area of public concern relies solely on the Court's ability to take judicial notice of facts alleged in his now-dismissed counterclaim. [Docket No. 25.] However, under Rule 201, the Court can only take judicial notice of facts that are "not subject to reasonable dispute" due to their ability to "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). This simply cannot be done here. Therefore, more discovery is necessary to make a proper determination as to whether this matter concerns a matter of public concern such that the actual malice standard and the protections afforded by the UPEPA apply. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29 (1971) (actual malice standard applies to protect speakers who discuss

14

"matters of public or general concern," even when the person claiming to be defamed is a private figure); N.J.S.A. § 2A:53A-50(b)(3).

### B.    Tortious Interference with Prospective Business Relations – Count III

Tortious interference claims are intentional torts. *See Remick v. Manfredy*, 238 F.3d 248, 260 (3d Cir. 2001). Under New Jersey law, "[i]f an intentional tort count . . . is predicated upon the same conduct on which the defamation count is predicated, the defamation cause completely comprehends the [intentional tort] cause." *LoBiondo v. Schwartz*, 733 A.2d 516, 530 (N.J. App. Div. 1999). Here, the contents of the X Post and the HEI Post form the basis for both Plaintiffs' defamation claims and their tortious interference claim. [Pls. Br. at 26 ("PAC's [Tortious Interference with a Prospective Business Relationship] claim arises out of Shaulis directing the Shaulis Posts at PAC's clients and business associates.").] Indeed, Plaintiffs argue that statements made in Shaulis' Posts "dissuade[d] professional athletes, industry experts, and educators from engaging with PAC," while also alleging that these same statements were defamatory. [Compl. at 16.] Shaulis believes this dual reliance should prove fatal to this claim. [Def. Br. at 23.] The Court, however, disagrees. At the pleadings stage, Plaintiffs need not identify a specific instance where they suffered professional reputational harm in the form of lost business as "general factual allegations of injury are sufficient." *Heartland Payment Sys., LLC v. Carr*, 2021 WL 302918, at *16 (D.N.J. Jan. 29, 2021). Rather, this claim will also proceed to limited discovery as to the extent of the damage, if any, the alleged defamatory posts caused Plaintiffs. Depending on what is revealed, Shaulis can re-raise his motion at that time.

15

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Pleadings will be **DENIED without prejudice**, and the matter will proceed with limited discovery as to the issue of public concern and Plaintiffs' business harm. An accompanying Order shall issue.


**December 15, 2025**                                      **s/Renée Marie Bumb**
Date                                                        RENÉE MARIE BUMB
                                                            Chief United States District Judge